## In re BUSY BEAVER BUILDING CENTERS, INC.

### Kirkpatrick & Lockhart, Appellant.*

### No. 92–3566.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit L.A.R. 34.1(a) May 13, 1993.

Decided March 11, 1994.

* Per FED.R.APP.P. 12(a).

Joy F. Conti, Paula A. Schmeck, Scott E. Westwood, Kirkpatrick & Lockhart, Pittsburgh, PA, for appellant, Kirkpatrick & Lockhart.

Robert P. Simons, Klett, Lieber, Rooney & Schorling, Pittsburgh, PA, for amici-curiae, Nat. Federation of Paralegal Associations, Inc., et al.

Before: BECKER, HUTCHINSON, and ROTH, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

Appellant Kirkpatrick & Lockhart ("K & L") provided legal services for the debtor Busy Beaver Building Centers, Inc. ("Busy Beaver"), in its Chapter 11 Bankruptcy proceedings, *see* 11 U.S.C.A. §§ 101–1330 (1993), before the United States Bankruptcy Court for the Western District of Pennsylvania. On February 25, 1991, after K & L had submitted one of its interim fee petitions to the bankruptcy court pursuant to § 331 of the Bankruptcy Code ("Code"), the bankruptcy court sua sponte issued an order disallowing certain requested items of compensation for services rendered by K & L paralegals which the court characterized as con-

stituting "purely clerical functions." Upon K & L's motion for reconsideration, the bankruptcy court held an evidentiary hearing to consider testimony regarding the disallowed fees.

In a December 5, 1991 Order accompanying a published memorandum opinion, the court determined that clerical services are not compensable under § 330(a) of the Code, and directed K & L to file an amended fee petition excluding charges or fees for clerical functions or services. *In re Busy Beaver Bldg. Ctrs., Inc.,* 133 B.R. 753, 758 (Bankr. W.D.Pa.1991). The district court affirmed the bankruptcy court's decision, and this uncontested appeal followed.[1] K & L has been litigating the matters raised in this appeal, from the bankruptcy court up through this Court, without compensation from its client Busy Beaver.

K & L's appeal requires us to address two fee-determination questions of considerable importance in the bankruptcy field which no court of appeals has ever decided. First, does a bankruptcy court have the power and obligation to review fee applications which have not been the subject of an objection by a party in interest or the United States trustee? We conclude that it does. Second, what standard should a court employ to determine whether specific paralegal services are compensable? After a thorough examination of the issue, we opt for an objective standard which incorporates the practices in the non-bankruptcy legal market. Accordingly, we will vacate the district court's order and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

### A. The Facts

Busy Beaver, a regional chain of do-it-yourself home center stores, filed a voluntary Chapter 11 petition for bankruptcy on December 12, 1990.[2] The bankruptcy court authorized K & L to represent Busy Beaver as

1. We attempted to secure the services of a practicing lawyer or law professor to act as *amicus curiae* in support of the position of the bankruptcy court and district court but, despite several months of effort, were unsuccessful.

2. Busy Beaver's reorganization proved successful when on March 31, 1992 the bankruptcy court confirmed its amended plan of reorganization.

its legal counsel. Like most law firms in the modern era of competitive legal markets, K & L strives to increase its efficiency and control its clients' legal costs, and to that end employs paralegals to perform paraprofessional services in connection with its rendition of legal services. As is the case with attorneys' services, K & L charges clients fees for paralegals' services based on each paralegal's individual skill and expertise.

From time to time during the pendency of Busy Beaver's bankruptcy petition, K & L filed with the bankruptcy court applications for interim compensation for services rendered by its professionals and paraprofessionals, and for the actual and necessary expenses it incurred in its representation. *See* 11 U.S.C.A. § 331 (1993). In many bankruptcy proceedings, courts grant such fee applications as a routine matter without the applicant encountering opposition from the court or any party in interest. But this application received considered attention, and on February 25, 1991, the bankruptcy court sua sponte issued an order denying compensation for certain services performed by paraprofessionals because, according to the court, they represented "purely clerical functions which are not compensable and which constitute normal overhead." Order, No. 90–03924 JKF, at 1 (Bankr.W.D.Pa. Feb. 25, 1991). The bankruptcy court declined to recognize as compensable paraprofessional services itemizations for several sorts of activities: filing motions at the bankruptcy court; preparing and organizing motions, pleadings, and documents for hearings; preparing and tabbing binders for hearings; distributing documents and other materials to creditors; and drafting and finalizing transmittal letters. *Id.* at 1–2; *accord* 133 B.R. at 755.

On April 16, 1991, in response to K & L's motion for reconsideration,[3] the bankruptcy court held an evidentiary hearing. A representative of the Office of the United States Trustee appeared at the hearing and subsequently filed a brief in opposition to K & L's motion for reconsideration, and a representa-

tive of *amicus curiae* the National Federation of Paralegal Associations, Inc. appeared and subsequently filed a brief in support of K & L's motion for reconsideration. At the hearing K & L proffered an affidavit and adduced testimony from six highly qualified witnesses, some of whom were experts on the subject of paralegals' training and responsibilities and others of whom were senior attorneys responsible for delegating legal assignments.

K & L proffered extensive testimony that paralegals, and not legal secretaries, typically organize and maintain forms, pleadings, and files, maintain calendars and tickler systems, mail and distribute pleadings and other correspondence, and perform the other sorts of activities the bankruptcy court had found non-compensable. The witnesses explained that paralegals are assigned these tasks because they require the exercise of professional judgment. With respect to the calendar and tickler system, for example, a K & L witness testified that a paralegal is expected not only to just know what a date is, but to understand the importance of the date and to follow up to make sure that the attorney gets timely notice of the date's approach and that either the attorney or the paralegal meets the deadline, "so it is a matter of exercising some judgment, not just dropping off a date or a reminder." To take another example, a different expert witness testified that a paralegal is charged with filing a motion because that task "involves making sure that all the proper exhibits and affidavits are there, appropriately [signed, collated, and] marked, that the Court gets the right copies, that all named parties or parties in interest get the appropriate copies, and that filing deadlines are maintained," and that a legal secretary cannot be relied upon to perform the task properly because "you have to have someone who knows what [he or she is] reading and knows the importance of what [he or she is] working on."

The same witness testified that a paralegal would need to exercise professional judgment

---

3. Indicative of the lack of adversariness in many bankruptcy fee proceedings, counsel for the unsecured creditors' committee joined K & L in seeking reconsideration and requested the bank-

ruptcy court to disburse compensation to K & L for all the paralegal services included in its fee application.

to organize files because organizing a file "doesn't just mean alphabetize, that means put it together in a format that the attorney can use at the time of trial and so that means that the person has to sit down, read the documents and make a judgment as to where it will be most effectively placed, where it goes logically, where it goes legally." She summarized: "The role of the paralegal is to diminish the involvement of the attorney in these more mundane tasks." A senior partner at K & L specifically explained the tasks for which the bankruptcy court had disallowed compensation and described how each involved some exercise of professional judgment. Other testimony focused not just on the rationales for utilizing paralegals, but also on the expanding role paralegals play in the legal profession today.

Taken as a whole, the evidence K & L proffered at the hearing showed that paralegals ordinarily perform services similar to those the bankruptcy court disallowed; that law firms [4] typically bill such services to their non-bankruptcy clients, who typically pay for them; and that if the court were to disallow paralegal assistance on such matters the paralegal profession would suffer a major setback, and attorneys would instead perform those services but at a greater expense to the debtor's estate.

## B. The Bankruptcy Court's Decision

After the evidentiary hearing, in a memorandum opinion dated December 5, 1991, the bankruptcy court again held clerical services uncompensable under § 330(a) of the Code and instructed K & L to file an amended fee application omitting charges or fees for clerical functions or services. *In re Busy Beaver Bldg. Ctrs.*, 133 B.R. 753, 758 (Bankr.W.D.Pa. 1991). From its postulate that the Code allows paralegals to be compensated only for "tasks which require an exercise of professional judgment," the court reasoned that "clerical or routine services" are not compensable as they "do not usually require [the exercise of professional] judgment." *Id.* at 756.

The evidentiary hearing persuaded the bankruptcy court that many of the disallowed services at issue require the exercise of professional judgment, but it nevertheless refused to grant K & L its requested fees for two reasons. First, the court concluded that K & L had not provided sufficient information in its fee application for the court to reach that conclusion earlier (before the evidentiary hearing). The court explained pointedly that it would require fee applicants to comply with the specificity requirements of Local Bankruptcy Rule of Procedure 9016.1 and that it generally would not hold an evidentiary hearing in the future to permit fee applicants to elucidate the specifics of services rendered. Thus, if the applicant failed its burden of proving compensability in the fee application, compensation would be denied. *Id.* at 757–58. Second, at least with respect to some of the disallowed services, the court reasoned that the evidentiary hearing had focused generally on paralegals' training and duties but had not sufficiently explicated the nature of the particular tasks for which the court had denied compensation. That is, K & L had failed to prove beyond question that each task "required independent [professional] judgment and decision-making," the purported precondition to obtaining compensation for those services. *Id.* at 757–58 & n. 3.

## C. The District Court's Decision

The district court on K & L's appeal agreed with the bankruptcy court that clerical services are never compensable under § 330 because they are accounted for in the attorneys' hourly rates, even if non-bankruptcy clients compensate law firms for such services. Mem. op. at 5–6. The court emphasized that a professional or paraprofessional may be compensated only for services commensurate with his or her skill, so if either were to perform a task not requiring the exercise of a level of judgment or skill upon which his or her level of compensation is predicated, the court would not award fees for that person's efforts under § 330. Mem. op. at 6–7. It agreed with K & L that Congress intended to allow bankruptcy attor-

---

4. Throughout this opinion we use the shorthand "firm" to include all attorneys, whether employed in law partnerships, by professional corporations, or as solo practitioners.

neys to charge competitive fees, but worried that the estate would be overcharged if attorneys or paralegals were compensated for services rendered more efficiently (cheaply) by legal secretaries. Mem. op. at 8–9.

The district court did recognize that in some instances the billing of clerical services can be customary—and compensable—if clerical overhead is not also included in the professional's fee, but it did not apply the theory to this case or describe how a court should determine whether or not clerical services are subsumed within overhead. Mem. op. at 7–8. The linchpin of the court's reasoning rested on the putative capacity of a non-bankruptcy client to challenge a legal bill by refusing payment, requesting a modification, or threatening termination of the attorney-client relationship, whereas it believed that the bankruptcy court can review fee applications only for abuses. Mem. op. at 8.

### D. Jurisdiction and Scope of Review

The bankruptcy court had subject matter jurisdiction pursuant to 28 U.S.C.A. §§ 157, 1334(b) (1993); the district court exercised its discretionary appellate jurisdiction pursuant to 28 U.S.C.A. § 158(a) (1993); and this Court has appellate jurisdiction pursuant to 28 U.S.C.A. § 158(d) (1993). We exercise plenary review over the bankruptcy court's and district court's conclusions of law. *E.g.,*

Sapos v. Provident Inst. of Savings, 967 F.2d 918, 922 (3d Cir.1992).

## II. THE REVIEW OF FEE APPLICATIONS

### A. Does the Bankruptcy Court Have the Power and Duty to Review Fee Applications Sua Sponte?

■ Because the bankruptcy court reduced the paralegal fee request sua sponte we must first consider whether it possessed the power to do so. Under § 330(a) of the Code, bankruptcy courts *may* award reasonable compensation for actual, necessary services rendered by the attorney and by paraprofessionals employed by the attorney, the reasonableness to be based on (i) the nature of the services, (ii) the extent of the services, (iii) the value of the services, (iv) the time spent on the services, and (v) the cost of comparable services in non-bankruptcy cases. 11 U.S.C.A. § 330(a) (1993).[5] The district and bankruptcy courts in this circuit have divided over the question whether bankruptcy courts have the authority to review fee applications when no party objects. One group of decisions holds that a bankruptcy court does have the power (or both the power and the duty) to do so, whereas the other group holds that the court has a restricted scope of review or no power to review under those circumstances.[6] No court of appeals

---

5. Section 330(a) provides in pertinent part:
 (a) After notice to any parties in interest and to the United States trustee and a hearing, ... the court may award ... to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—
 (1) reasonable compensation for actual, necessary services rendered by such ... professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such ... professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title....
 11 U.S.C.A. § 330(a) (1993).

6. *Compare In re Gulph Woods Corp.,* 150 B.R. 603, 605–06 & n. 5 (E.D.Pa.1993) (bankruptcy court has the power and the duty to review fee applications independently), *In re Paul,* 141 B.R. 299, 301, 302 (E.D.Pa.1992) (same), *In re Metro Transp. Co.,* 107 B.R. 50, 53 (E.D.Pa.1989) (same), *In re Peter J. Schmitt Co.,* 154 B.R. 632,

634 (Bankr.D.Del.1993) (same), *In re Evans,* 153 B.R. 960, 967–68 (Bankr.E.D.Pa.1993) (same), *In re Rheam of Ind., Inc.,* 137 B.R. 151, 155–59 (Bankr.E.D.Pa.) *("Rheam IV")* (same), *vacated,* 142 B.R. 698 (E.D.Pa.1992) *("Rheam V"),* In re Leedy Mortg. Co., 126 B.R. 907, 915–16 (Bankr. E.D.Pa.1991) (same), *In re Sounds Distrib. Corp.,* 122 B.R. 952, 957 (Bankr.W.D.Pa.1991) (same), *In re Rheam of Ind., Inc.,* 133 B.R. 325, 330–33 (E.D.Pa.1991) *("Rheam III")* (bankruptcy court has the power to review fee applications independently), *In re National Paragon Corp.,* 87 B.R. 11, 13 (E.D.Pa.1988) (same), *In re J.A. & L.C. Brown Co.,* 75 B.R. 539, 539–40 (E.D.Pa.1987) (same) *and In re Patronek,* 121 B.R. 728, 729–30 & n. 4 (Bankr.E.D.Pa.1990) (same) *with In re Jensen's Interiors, Inc.,* 132 B.R. 105, 106 (E.D.Pa.1991) (bankruptcy court lacks the authority to reduce attorneys' fees sua sponte), *In re Pendleton,* No. 90–1091, 1990 WL 29645, at *1 (E.D.Pa. Mar. 15, 1990) (same), *In re T & D Tool, Inc.,* 132 B.R. 525, 526, 528 n. 1 (E.D.Pa.1991) (same), *In re Rheam of Ind., Inc.,* 142 B.R. 698, 700 (E.D.Pa.1992) *("Rheam V")* (bankruptcy

has yet explicitly decided this important question.

We think the answer is straightforward. Rule 2017(b) expressly spells out the power of the bankruptcy court to review fee applications (with respect to a debtor's attorney) on its own initiative, providing that:

> on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or transfer of property, or any agreement therefor, by the debtor to an attorney after entry of an order for relief in a case under the Code is excessive ... if the payment, transfer, or agreement is for services in any way related to the case.

FED.R.BANKR.P. 2017(b) (West Supp.1993). In our view, this result follows also simply from the wording of § 330(a), which states that "the court *may award*" reasonable compensation—language which imbues the court with discretionary authority. Finally, we read § 105(a) of the Code as providing clear and compelling authority for the bankruptcy court's sua sponte review of fee or expense applications. That section provides in part:

> No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement orders or rules, or to prevent an abuse of process.

11 U.S.C.A. § 105(a) (1993).

Beyond possessing the power, we think the bankruptcy court has a *duty* to review fee applications, notwithstanding the absence of objections by the United States trustee ("UST"), creditors, or any other interested party, a duty which the Code does not expressly lay out but which we believe derives from the court's inherent obligation to monitor the debtor's estate and to serve the public interest. *See* 11 U.S.C.A. § 105(a); *see also In re Martin,* 817 F.2d 175, 180 (1st Cir.1987) (referring to the "bankruptcy court's fundamental responsibility to monitor the integrity of the proceedings before it");

*In re Wonder Corp. of America,* 82 B.R. 186, 191 (D.Conn.1988) (recognizing the "overarching policy of avoiding the waste of the debtor's estate"). Viewed in juxtaposition with its inherent responsibility for its judicial actions, the court's statutory obligation to sign off on fee applications strengthens our conviction. *See In re Metro Transp. Co.,* 107 B.R. 50, 53 (E.D.Pa.1989); *In re Temple Retirement Community, Inc.,* 97 B.R. 333, 337 (Bankr.W.D.Tex.1989) (referring to the bankruptcy court's "duty to preserve the integrity of the court" by "independently determining that court authorization for the fees is warranted" before signing an order awarding fees). This view was eloquently expressed by the bankruptcy court in *In re Evans,* 153 B.R. 960 (Bankr.E.D.Pa.1993):

> [T]he integrity of the bankruptcy system ... is at stake in the issue of a bankruptcy judge's performance of the duty to review fee applications sua sponte. The public expects, and has a right to expect, that an order of a court is a judge's certification that the result is proper and justified under the law.... Nothing better serves to allay [public perceptions that high professional fees unduly drive up bankruptcy costs] than the recognition that a bankruptcy judge, before a fee application is approved, is obliged to [review it carefully] and find it personally acceptable, irrespective of the (always welcomed) observation of the [United States trustee] or other interested parties.

*Id.* at 968; *accord Rheam IV,* 137 B.R. at 159.

Indeed, section 330 shares with "fund-in-court" cases a salient feature—"the potential for conflicts of interest between the attorneys seeking compensation and their clients"—which imposes upon the bankruptcy court "an independent duty to scrutinize fee applications." *Cunningham v. City of McKeesport,* 753 F.2d 262, 267 (3d Cir.1985), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986), *reinstated,* 807 F.2d 49 (3d Cir.1986), *cert. denied,* 481

---

court's discretion to deny fees is more limited when the application is unopposed) *and In re Delaware River Stevedores, Inc.,* 147 B.R. 864, 868–70 (Bankr.E.D.Pa.1992) (same). *Fleet v.*

*United States Consumer Council,* No. 89–7527, 1990 WL 18926, at *1 (E.D.Pa. Feb. 23, 1990) appears to have been a statutory fee case, see *In re Fleet,* 95 B.R. 319,. 336–37 (E.D.Pa.1989).

U.S. 1049, 107 S.Ct. 2179, 95 L.Ed.2d 836 (1987). Bankruptcy cases do not, on the other hand, share a common bond with "statutory fee" cases. In that genre of cases, the adversarial nature of the proceedings, the result of the losing parties' obligation to bear the burden of the fees awarded, guarantees that someone other than the court will closely review the fee request and will bring to the court's attention potential deficiencies, hence ensuring a more precise fee award. *See In re Gulph Woods Corp.,* 150 B.R. 603, 606 (E.D.Pa.1993); *Cunningham,* 753 F.2d at 267 (holding that a district court may not sua sponte reduce attorney fees in a civil rights suit except with respect to matters over which the judge possesses special knowledge); *McDonald v. McCarthy,* 966 F.2d 112, 118–19 (3d Cir.1992) (reaffirming *Cunningham*); *Bell v. United Princeton Properties,* 884 F.2d 713, 719 (3d Cir.1989) (applying *Cunningham* to a settlement agreement in an Employee Retirement Income Security Act of 1974 ("ERISA") suit). We agree with *In re Rheam of Ind., Inc.,* 133 B.R. 325, 331 (E.D.Pa.1991) ("*Rheam III*") that for the various reasons enumerated *infra* at 842–43, "[t]he same is not true in bankruptcy proceedings."

Some courts have reasoned that the UST, not the bankruptcy court, has the duty to review fee applications. Congress has clearly delegated to the UST the discretion to assure that fee awards and expense reimbursements are reasonable, a delegation which may at first blush appear exclusive. *See* 28 U.S.C.A. § 586(a)(3)(A) (1993); [7] *see also* FED.R.BANKR.P. 2017 advisory comm. notes (West Supp.1993) ("It is consistent with [the trustee's supervisory and monitoring] role to expect the United States trustee to ... file motions relating to excessive fees pursuant to § 329 of the Code."); *In re Jensen's Interiors, Inc.,* 132 B.R. 105, 105–06 (E.D.Pa.1991). In practice, however, per-

haps because hampered by insufficient resources or distracted by other administrative duties, *see In re Rheam of Ind., Inc.,* 137 B.R. 151, 156 (Bankr.E.D.Pa.1992) ("*Rheam IV*") (quoting *In re Leedy Mortg. Co.,* 126 B.R. 907, 915–16 (Bankr.E.D.Pa.1991)), *vacated,* 142 B.R. 698 (E.D.Pa.1992) ("*Rheam V*"); *Rheam III,* 133 B.R. at 332, the UST reviews fee applications with insufficient uniformity and zeal to allow the bankruptcy court to abstain from its obligation to review fee applications under § 330, *see Rheam IV,* 137 B.R. at 157 n. 3 ("[I]n this jurisdiction, the UST has left the area of review of fee applications almost exclusively to this court.").

■ It is not the trustee's responsibility to review all fee applications, since Congress plainly only delegated to the trustee the *discretion* to review a fee application. *See* 28 U.S.C.A. § 586(a)(3) (1993). Thus we think that Congress' grant of authority to the UST to challenge fee petitions merely bestows the UST with standing and/or encourages the UST to do so; it in no way signifies by negative implication that the bankruptcy court is without the power and duty to review fee applications independently when the UST does not object. Unless the parties in interest or the bankruptcy courts take on this task, many if not most fee applications would receive no effective review.

Moroever, at least before some benches, objections to fee applications by parties other than the UST are also relatively uncommon. *See, e.g., Rheam IV,* 137 B.R. at 157 n. 3; *In re Nor–Les Sales, Inc.,* 32 B.R. 900, 902 (Bankr.E.D.Mich.1983) ("Seldom are objections lodged to fee requests."), *modified sub nom. Stark & Reagan, P.C. v. Nor–Les Sales,* 53 B.R. 442 (E.D.Mich.1984); *In re Pettibone Corp.,* 74 B.R. 293, 300 (Bankr. N.D.Ill.1987) (same); *In re Jensen–Farley*

---

7. That section provides in pertinent part:
 (a) Each United States trustee, within the region for which such United States trustee is appointed, shall—

 . . . . .

 (3) supervise the administration of cases and trustees in cases under chapter 7, 11, or 13 of title 11 by, whenever the United States trustee considers it to be appropriate—

 (A) monitoring applications for compensation and reimbursement filed under section 330 of title 11 and, whenever the United States trustee deems it to be appropriate, filing with the court comments with respect to any of such applications[.]

 . . . . .

 28 U.S.C.A. § 586(a) (1993).

*Pictures, Inc.*, 47 B.R. 557, 585 n. 39 (Bankr. D.Utah 1985) (same); American Bankruptcy Institute, *American Bankruptcy Institute National Report on Professional Compensation in Bankruptcy Cases* § 5.1, at 53 (G.D. Warner rep. 1991) [hereinafter "*ABI National Report*"]. The debtor will often not object to its attorney's fee application because the fees will frequently be derived from its creditors' award rather than its own assets, *see In re Temple Retirement Community,* 97 B.R. at 337, or in any case it may be "in no position to make an objective judgment as to the value of the legal services involved, [and it may lack the] inclination to object to whatever fee is requested by the attorney who has made it possible for [it] to continue business," *In re Hamilton Hardware Co.*, 11 B.R. 326, 329–30 (Bankr.E.D.Mich.1981).

Attorneys for the creditors may also be reluctant to oppose fee requests, whether because of perceived professional courtesy, *see In re Hamilton Hardware Co.*, 11 B.R. at 330 n. 1 (observing that continuing associations in the relatively closed Bankruptcy Bar "foster[ ] a club atmosphere which militates against effective client representation in matters relating to compensation"); fear of retaliation, *see In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 585 n. 39 (Bankr.D.Utah 1985) ("Objections to fee requests often invite retaliation. . . ."); *ABI National Report, supra*, § 5.2, at 40; *cf. In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1255 (5th

Cir.1986) (referring to "a conspiracy of silence" with regard to contesting fee applications); the expectation that the expense of challenging fee applications is not cost-justified because of a creditor's modest interest in each dollar the estate saves, *Rheam III*, 133 B.R. at 331–32; and/or the fact that, should it lose, the creditor's reward for fighting that battle may be a smaller distribution due to its indirect obligation to pay a proportionate share of the fee applicant's fees ascribable to the defense of his or her fee request, *see infra* at 847 & n. 17 (discussing split of authority regarding whether time spent pursuing fees is compensable). *See In re Ginji Corp.*, 117 B.R. 983, 989 (Bankr.D.Nev.1990). Consequently, the task of reviewing fee applications falls by default onto the bankruptcy courts.

We are keenly aware that many bankruptcy courts have bemoaned their duty to review fee applications as a thankless, onerous burden, one which consumes a significant share of a bankruptcy judge's time, *see* Gordon Bermant, Patricia A. Lombard & Elizabeth C. Wiggins, *A Day in the Life: The Federal Judicial Center's 1988–89 Bankruptcy Court Time Study*, 65 AM.BANKR.L.J. 491, 513–14 (1991). But in holding that bankruptcy courts have an independent duty to review fee applications even absent objections, we find support in legions of cases decided by bankruptcy and district courts spanning nearly two-thirds of all federal districts [8] as

**8.** *See, e.g., In re Cascade Oil Co.*, 126 B.R. 99, 106 (D.Kan.1991); *In re NRG Resources, Inc.*, 64 B.R. 643, 650 (W.D.La.1986); *In re Ralph Marcantoni & Sons*, 62 B.R. 245, 247 (D.Md.1986); *Cohen & Thiros, P.C. v. Keen Enters., Inc.*, 44 B.R. 570, 574–75 (N.D.Ind.1984); *In re Colonial Distrib. Co.*, 314 F.Supp. 418, 420 (D.S.C.1970) (pre-amendments); *In re Maruko, Inc.*, 160 B.R. 633, 637 (Bankr.S.D.Cal.1993); *In re Corporacion de Servicios Medico–Hospitalarios de Fajardo, Inc.*, 155 B.R. 1, 1 (Bankr.D.P.R.1993); *In re Peter J. Schmitt Co.*, 154 B.R. 632, 634 (Bankr. D.Del.1993); *In re Evans*, 153 B.R. 960, 967–68 (Bankr.E.D.Pa.1993); *In re Costello*, 150 B.R. 675, 677 (Bankr.E.D.Ky.1992); *In re Bonneville Pac. Corp.*, 147 B.R. 803, 805 (Bankr.D.Utah 1992); *In re East Peoria Hotel Corp.*, 145 B.R. 956, 959 (Bankr.C.D.Ill.1991); *In re Scoggins*, 142 B.R. 940, 943 (Bankr.D.Or.1992); *In re Gillett Holdings, Inc.*, 137 B.R. 475, 480 (Bankr. D.Colo.1992); *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 839 (Bankr.C.D.Cal.1991); *In re Bank of New England Corp.*, 134 B.R. 450, 453 (Bankr.D.Mass.1991), *aff'd*, 142 B.R. 584 (D.Mass.1992); *In re Bennett*, 133 B.R. 374, 377 (Bankr.N.D.Tex.1991); *In re Viscount Furniture Corp.*, 133 B.R. 360, 362 (Bankr.N.D.Miss.1991); *In re Saturley*, 131 B.R. 509, 516 (Bankr.D.Me. 1991); *In re Gold Seal Prods. Co.*, 128 B.R. 822, 827 & n. 3 (Bankr.N.D.Ala.1991); *In re Sounds Distrib. Corp.*, 122 B.R. 952, 957 (Bankr.W.D.Pa. 1991); *In re Amstar Ambulance Serv., Inc.*, 120 B.R. 391, 394 (Bankr.N.D.W.Va.1990); *In re Zenith Lab., Inc.*, 119 B.R. 51, 54 (Bankr.D.N.J. 1990); *In re Great Sweats, Inc.*, 113 B.R. 240, 242 (Bankr.E.D.Va.1990); *In re Gary Fairbanks, Inc.*, 111 B.R. 809, 811 (Bankr.N.D.Iowa 1990); *In re Oberreich*, 109 B.R. 936, 937 (Bankr. E.D.Wis.1990); *In re Crimson Inv., N.V.*, 109 B.R. 397, 400 (Bankr.D.Ariz.1989); *In re Bilgutay*, 108 B.R. 333, 336 n. 2 (Bankr.M.D.Fla. 1989); *In re Inslaw, Inc.*, 106 B.R. 331, 333–34 (Bankr.D.D.C.1989); *In re Kroh Bros. Dev. Co.*, 105 B.R. 515, 520 (Bankr.W.D.Mo.1989); *In re Hogg*, 103 B.R. 207, 209 (Bankr.D.S.D.1988); *In re Command Servs. Corp.*, 102 B.R. 905, 910

844

well as in the writings of several renowned commentators.[9] We find additional support in the legislative history to the 1978 amendments to the Code[10] and in a number of court of appeals' decisions (including one from this Court) cogently resolving related points.[11] Disagreeable as the chore may be, the bankruptcy court must protect the estate, lest overreaching attorneys or other professionals drain it of wealth which by right should inure to the benefit of unsecured creditors. *See, e.g., Cohen & Thiros, P.C. v. Keen Enters., Inc.,* 44 B.R. 570, 573 (N.D.Ind.1984).

■ That said, we deem it necessary at this juncture to restate in this context what we have stressed in another: that we

(Bankr.N.D.N.Y.1989); *In re Washington Mfg. Co.,* 101 B.R. 944, 950 (Bankr.M.D.Tenn.1989); *In re Mayes,* 101 B.R. 494, 496 (Bankr. W.D.Tenn.1988); *In re Tennessee Valley Ctr. for Minority Econ. Dev.,* 99 B.R. 845, 847 (Bankr. W.D.Tenn.1989); *In re Florida Brethren Homes, Inc.,* 97 B.R. 652, 653 n. 2 (Bankr.S.D.Fla.1989); *In re Temple Retirement Community,* 97 B.R. 333, 336, 338 (Bankr.W.D.Tex.1989); *In re Reed,* 95 B.R. 626, 628 (Bankr.E.D.Ark.1988); *In re Public Serv. Co. of N.H.,* 93 B.R. 823, 827 (Bankr. D.N.H.1988); *In re Gulf Consol. Servs., Inc.,* 91 B.R. 414, 415 (Bankr.S.D.Tex.1988); *In re Ross,* 88 B.R. 471, 474–75 (Bankr.M.D.Ga.1988); *In re Garber,* 88 B.R. 15, 16 (Bankr.D.R.I.1988); *In re Pothoven,* 84 B.R. 579, 583 (Bankr.S.D.Iowa 1988); *In re Watkins Glen Grand Prix Corp.,* 81 B.R. 232, 234 n. 5 (Bankr.W.D.N.Y.1988); *In re Jessee,* 77 B.R. 59, 61 (Bankr.W.D.Va.1987); *In re Pettibone Corp.,* 74 B.R. 293, 299–300 (Bankr. N.D.Ill.1987); *In re Westfall,* 73 B.R. 186, 189 & n. 1 (Bankr.W.D.Ark.1986); *In re Mansfield Tire & Rubber Co.,* 65 B.R. 446, 455 (Bankr.N.D.Ohio 1986); *In re Esar Ventures,* 62 B.R. 204, 205 (Bankr.D.Haw.1986); *In re Cuisine Mag., Inc.,* 61 B.R. 210, 219 (Bankr.S.D.N.Y.1986); *In re Thomas, Inc.,* 43 B.R. 510, 511 (Bankr.D.Mass. 1984); *In re Four Star Terminals, Inc.,* 42 B.R. 419, 426 n. 1 (Bankr.D.Alaska 1984); *In re Daylight Transp., Inc.,* 42 B.R. 20, 21, 26 (Bankr. E.D.N.Y.1984); *In re Watson Seafood & Poultry Co.,* 40 B.R. 436, 438 (Bankr.E.D.N.C.1984); *In re Garnas,* 40 B.R. 140, 141 (Bankr.D.N.D.1984); *In re Wilson Foods Corp.,* 36 B.R. 317, 320 (Bankr.W.D.Okla.1984); *In re Nor–Les Sales, Inc.,* 32 B.R. 900, 902 (Bankr.E.D.Mich.1983), *modified sub nom. Stark & Reagan, P.C. v. Nor–Les Sales,* 53 B.R. 442 (E.D.Mich.1984); *In re International Coins & Currency, Inc.,* 26 B.R. 256, 260 (Bankr.D.Vt.1982); *In re Liberal Mkt., Inc.,* 24 B.R. 653, 657 (Bankr.S.D.Ohio 1982); *In re Crutcher Transfer Line, Inc.,* 20 B.R. 705, 710 (Bankr.W.D.Ky.1982); *see also In re Gulf Hills Dev. Corp.,* 60 B.R. 366, 366, 368 (S.D.Miss. 1985). *But see In re Jensen's Interiors, Inc.,* 132 B.R. 105, 106 (E.D.Pa.1991); *In re Pendleton,* No. 90–1091, 1990 WL 29645 (E.D.Pa. March 15, 1990); *cf. In re Rheam of Ind., Inc.,* 142 B.R. 698, 700 (E.D.Pa.1992) ("*Rheam V*") (bankruptcy court's discretion is more circumscribed when no party objects); *In re T & D Tool, Inc.,* 132 B.R. 525, 526 (E.D.Pa.1991) (same); *In re Peoples Sav. & Inv., Inc.,* 103 B.R. 264, 274 (Bankr. E.D.Okla.1989) (same).

9. *E.g.,* 2 COLLIER ON BANKRUPTCY ¶ 330.05[2][a], at 330–37 (15th ed. Lawrence P. King ed. 1993)

("[T]he ultimate responsibility for assessing the reasonableness of compensation awarded to professionals and other officers of the estate remains ... with the judiciary."); R.E. GINSBURG, BANKRUPTCY ¶ 4501 (1985) ("Even if no party in interest objects ... the court should review the application to make sure the compensation sought has been earned and is reasonable."); *see also* Harold Lavien, *Fees as Seen from the Bankruptcy Bench,* 89 COM.L.J. 136, 138 (1984).

10. The Joint Explanatory Statement, which described the floor managers' compromise on the Bankruptcy Reform Act of 1978 to both chambers, explains: "Attorneys' fees in bankruptcy cases can be quite large and *should be closely examined by the court.*" 124 CONG. REC. 32,394 (1978) (Joint Explanatory Statement) (remarks of Rep. Edwards) (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. 6436, 6442; *accord* 124 CONG. REC. 33,994 (1978) (Joint Explanatory Statement) (remarks of Sen. DeConcini), *reprinted in* 1978 U.S.C.C.A.N. 6505, 6511.

11. *See In re York Int'l Bldg., Inc.,* 527 F.2d 1061, 1068 (9th Cir.1975) (dicta) ("The district courts have a duty to examine carefully all claims presented even though no objections have been filed."); *In re Beverly Mfg. Corp.,* 841 F.2d 365, 369, 370 (11th Cir.1988) (stating that a bankruptcy court must hold an evidentiary hearing on its own motion when the petitions for compensation inadequately develop the factual basis for the fee awards); *In re Meade Land & Dev. Co.,* 527 F.2d 280, 284 (3d Cir.1975) (dicta) (stating in a case where counsel applied for just shy of 250 hours of compensation without breaking down the charges that, "absent unusual circumstances, it is the court's independent obligation to give credit only where there are supporting documents, even in cases where no interested parties raise objections to the claim"); *see also In re Callister,* 673 F.2d 305, 307 (10th Cir.1982) ("'[A]ll expenses of administration must receive the court's final scrutiny and appraisal.'" (quoting 2 COLLIER ON BANKRUPTCY ¶ 331.03 (5th ed. 1981))); *Jordan v. Mark IV Hair Styles, Inc.,* 806 F.2d 695, 697 (6th Cir.1986) (holding that a district court has to review an award of attorneys' fees in a civil rights class action suit for reasonableness, even absent an objection, because the attorney representing the class holds a position of public trust (quoting 3B MOORE's FEDERAL PRACTICE ¶ 23.91, at 23–568 (1978))).

do not intend that a district [or bankruptcy] court, in setting an attorney['s] fee, become enmeshed in a meticulous analysis of every detailed facet of the professional representation. It ... is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps even dwarfing the case in chief.

*Lindy Bros. Builders, Inc. v. American Radiator & Std. Sanitary Corp.*, 540 F.2d 102, 116 (3d Cir.1976) (in banc) (*"Lindy II"*). Because its time is precious, the reviewing court need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee to which the professional is ideally entitled.[12] At all events, the bankruptcy and district courts here acted properly in reviewing K & L's fee request despite the absence of any objection.

B. *Did K & L Forfeit Its Right to Compensation for Time Spent by Its Paralegals by Failing to Meet the Specificity Requirements of the Local Rule?*

■ The bankruptcy court apparently ruled that, because K & L did not meet the specificity requirements of applicable bankruptcy rules, including Local Bankruptcy Rule of Procedure 9016.1, it forfeited its right to compensation. *See In re Busy Bea-*

ver, 133 B.R. at 757–58. We do not doubt the applicant's duty to submit fee applications with enough detail to enable the court to reach an informed decision—one necessarily grounded in complete, coherent information—as to whether the requested compensation is justified. *E.g., In re Nucorp Energy, Inc.*, 764 F.2d 655, 658 (9th Cir.1985); *In re Temple Retirement Community, Inc.*, 97 B.R. at 339 (collecting cases); *see* FED. R.BANKR.P. 2016(a).[13] But the bankruptcy court did not specify the precise shortcomings of K & L's fee application. Even if, as seems to be the case, the court was unable to discern whether the work the paralegals performed necessitated the exercise of independent paraprofessional judgment (information we believe pertinent to the court's evaluation of the rate of compensation the paralegal has earned and thus information which we agree should be included in a fee application), we do not read *Rule 9016.1* as specifying that fee applicants must substantiate this fact.[14]

■ In any event, we are convinced that if the bankruptcy court plans to disallow certain items of compensation, § 330(a) on its face first contemplates the applicant's right to a hearing.[15] We understand that a court

---

12. We also think it not befitting the stature of a federal bankruptcy judge to spend wasteful hours poring over fee applications to tabulate and cross-reference unorganized billing statements. Bankruptcy courts might consider prescribing procedures for the submission of organized, coherent, readable fee applications. Guidance may be found in Alan Hirsch & Diane Sheehey, *The Award and Management of Attorneys' Fees in the Federal Courts* (Federal Judicial Center, Washington, D.C. forthcoming 1994). Moreover, today one can readily find computer software which automatically summarizes, correlates, and in other ways renders comprehensible involved legal bills. Perhaps the bankruptcy courts should consider requiring professionals submitting lengthy fee applications to submit them also on a computer disk in a format readable by a specified commercially available computer program, or simply requiring the professionals to tabulate the fee requests in several different conducive ways, such as by person, by day, and by activity/assignment.

13. The relevant portion of that Rule provides:

*Application for Compensation or Reimbursement.* An entity seeking interim or final compensation for services ... from the estate shall

file an application setting forth a detailed statement of (1) the services rendered [and] time expended ..., and (2) the amounts requested. FED.R.BANKR.P. 2016(a).

14. The relevant portion of the local Rule states:

All entries shall conform to the following:
1. List each service or task separately and state the amount of time expended in its performance;
2. Identify the subject matter of any correspondence or phone call and the party with whom you have communicated if the service involves telephone and/or written correspondence;
3. Identify where appropriate, and in the interest of clarity, the subject matter of any hearing or trial with specificity including the case, or adversary number if the service involved is attendance at a hearing or trial;
4. Identify any pleading with specificity if the service involves preparation of a pleading[.]
LOCAL BANKR.R.P. 9016.1 (W.D.Pa.1992).

15. Section 330(a) begins "[a]fter notice ... and a hearing," a phrase Rule 2017(b) also contains. Section 102(1) of the Code defines it thus:

may simply wish to note its specific concerns, if any, and allow the fee applicant a reasonable opportunity to supplement his or her fee application in response thereto before holding an oral hearing, as hearings on a routine matter like compensation for services might overwhelm already swollen calendars. *See, e.g., Cohen & Thiros,* 44 B.R. at 573 (bankruptcy court allowed fee applicant two opportunities to supplement its fee petition); *In re Garrison Liquors, Inc.,* 108 B.R. 561, 566 (Bankr.D.Md.1989) (allowing fee applicant to supplement the application); *cf. In re Pettibone Corp.,* 74 B.R. 293, 300–01 (Bankr. N.D.Ill.1987) (holding the ordinary standards for reconsideration apply when a fee applicant seeks to supplement the fee application after a full hearing). But if the court does disallow fees of a "good-faith applicant," the Code, *see* §§ 329(b), 330(a); *see also* Rule 2017(b)—and perhaps even the dictates of due process, *see* U.S. CONST., amend. V—

"[A]fter notice and a hearing", or a similar phrase—
(A) means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances; but
(B) authorizes an act without an actual hearing if such notice is given properly and if—
 (i) such a hearing is not requested timely by a party in interest; or
 (ii) there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act....
11 U.S.C.A. § 102(1) (1993).

16. *See, e.g., In re Beverly Mfg. Corp.,* 841 F.2d 365, 370 (11th Cir.1988) ("If there are disputed issues of fact, an evidentiary hearing *must* be held to facilitate their resolution." (emphasis in original, citation omitted)); *In re U.S. Golf Corp.,* 639 F.2d 1197, 1202 (5th Cir.1981) ("the judge must hold an evidentiary hearing if there are any disputed factual issues"); *In re Paul,* 141 B.R. 299, 301 (E.D.Pa.1992) ("If the [Bankruptcy Court] has concerns about the amount sought or the hours or nature of work performed, it must hold a hearing, as required under § 330 of the [Code], in order to afford the attorney an opportunity to present his or her position and respond to the Court's questions about the application. The Bankruptcy Court ... may not reduce the amount sought without a hearing."); *see also Blum v. Stenson,* 465 U.S. 886, 892 n. 5, 104 S.Ct. 1541, 1545 n. 5, 79 L.Ed.2d 891 (1984); *Cunningham,* 753 F.2d at 266–67; *Lindy Bros. Builders, Inc. v. American Radiator & Std. Sanitary Corp.,* 487 F.2d 161, 167 (3d Cir.1973) ("*Lindy I* "), *appeal after remand,* 540 F.2d 102 (3d Cir.1976) (in banc) ("*Lindy II* ").

mandates that the court allow the fee applicant an opportunity, should it be requested, to present evidence or argument that the fee application meets the prerequisites for compensation; canons of fairness militate against forfeiture of the requested fees simply because the court's audit of the application uncovers some ambiguity or objection.[16] By good-faith applicant we mean to refer to a fee applicant who reasonably and in good faith attempts to comply with the applicable rules governing the format and substance of fee applications.

■ To make the hearing meaningful, the court should first apprise the applicant of the particular questions and objections it harbors, a role which the adversary in a statutory fee case would typically play. *See Rheam IV,* 137 B.R. at 155 (stating that the court holds hearings whenever, but only when, it has questions about the fee application). Contrary to a typical adversarial proceeding,

*Blum v. Witco Chem. Corp.,* 829 F.2d 367, 377 (3d Cir.1987) is not controlling. That case involved a grant of attorneys' fees to the prevailing plaintiff in a suit brought under the Age Discrimination in Employment Act of 1967, *see* 29 U.S.C. § 626(b). The defendant objected to the award of the fees on the ground, *inter alia,* that the district court failed to hold an evidentiary hearing. This Court held that failure did not constitute reversible error because there were no legally cognizable questions of fact disputed by the parties which required a further development of the facts. *Id.* at 377–78. That result followed, however, from a characterization of disputes over fees arising from fee shifting statutes as adversarial litigation, *see supra* at 841–42, whereas the same is not true in bankruptcy proceedings for the reasons set forth *supra* at 842–43. Indeed, a bankruptcy court, when it disallows certain fees, simulates the role of an adversary, albeit to a circumscribed degree, requiring that any "disputed" matter be resolved at a fair hearing. *See* 11 U.S.C.A. § 330(a) (1993).

At the hearing, held after notice of the court's concerns and/or objections, the court should allow the applicant a reasonable opportunity to present legal arguments and/or evidence, as the case may be, to clarify or supplement the petition and accompanying affidavit. Of course, the anatomy of the hearing lies within the sound discretion of the bankruptcy judge, and would not necessarily require the presentation of oral testimony. For example, the type of hearing which "is appropriate in the particular circumstances" might simply be an oral hearing (whether in court or more informally, as by teleconference) at which the applicant submits argument based upon the papers. The essential point is that the court should give counsel a *meaningful* opportunity to be heard.

when the bankruptcy court clothed in its administrative robe fulfills its duty to review a fee application without the applicant being present, the applicant cannot possibly know what evidence or legal theories the court is contemplating when it decides to disallow certain fees. Unless the applicant is afforded an opportunity to rebut or contest the court's conclusions, the applicant would unfairly and undesirably be deprived of the chance to respond to and assuage the court's questions and concerns. Besides, the bankruptcy bar might well react to a regime offering the applicant no chance to respond to the court's concerns by spending an inordinate amount of time preparing overly detailed fee applications, which time might be billable to the estate,[17] in an effort to anticipate all the idiosyncracies and inconsistencies of review the divers bankruptcy judges might exhibit.

■ In sum, if after initial review the bankruptcy court determines that, while the fee applicant made a good faith effort to comply with the particularization requirements of § 330(a), Rule 2016(a), and applica-

ble local rules, either the information provided does not allow for a reliable determination of compensability (because it is too vague or otherwise), or that the court would benefit from legal argument, it may allow the professional a reasonable time to supplement the application with either a more detailed description of the questionable services, or with a memorandum of points and authorities in support of the application, respectively. If the bankruptcy court at any time, irrespective of any opportunity to supplement, denies some amount of the requested compensation, and if it determines the applicant sought in good faith to comply with the aforementioned specificity requirements, it should notify the applicant of its particular reasons for denying the fees, and, should he or she make a timely request for one, allow the professional the occasion to defend his or her fee application with legal arguments and/or evidence (of market practices, etc.) at a hearing. Moreover, if after the hearing the court adheres to its views and disallows some of the requested compensation, it should enter sufficient findings of fact and conclusions of law in the

17. *Compare, e.g., In re Nucorp Energy,* 764 F.2d at 658–59 & n. 4 (holding such time compensable), *In re Braswell Motor Freight Lines, Inc.,* 630 F.2d 348, 351 (5th Cir.1980), *In re Bryant,* 111 B.R. 474, 480 (E.D.Pa.1990) *and In re J.A. & L.C. Brown Co.,* 75 B.R. 539, 540 (E.D.Pa.1987) *with, e.g., In re Central R.R. Co. of N.J.,* 477 F.Supp. 1228, 1233 (D.N.J.1979) (holding such time noncompensable), *In re Alan I.W. Frank Corp.,* 71 B.R. 585, 586 (Bankr.E.D.Pa.1987) *and In re Shaffer–Gordon Assocs., Inc.,* 68 B.R. 344, 349–50 (Bankr.E.D.Pa.1986). *See In re Chicago Lutheran Hosp. Ass'n,* 89 B.R. 719, 736 (Bankr. N.D.Ill.1988) (noting the split of authority); *In re Vogue,* 92 B.R. 717, 719 (Bankr.E.D.Mich.1988) (same).

In *In re Vogue,* 92 B.R. at 720, the court applied a market-oriented approach:
The question is really factual in nature ...: Do attorneys normally bill their clients for the time spent in preparing their bill [or] the time spent meeting with a client to explain, discuss, negotiate or haggle over (the practical equivalent of appearing in court on a fee application) their bill?
The court realized, too, that certain procedures for bill approval unique to bankruptcy cases may alter the answer to the above questions to the extent that the bankruptcy procedures are materially more onerous, but the court concluded that the fee applicant in the case before it had failed to proffer any evidence of either a practice of billing such services in non-bankruptcy cases, or

of material differences between non-bankruptcy and bankruptcy review procedures (as the court would require before it would grant compensation for such work if non-bankruptcy clients did not pay for such work). *See id.* at 720, 724. Thus, for example, if a fee applicant can demonstrate that non-bankruptcy clients require substantially less documentation and are considerably more deferential to the professional's exercise of judgment concerning which fees are billable (resulting in considerable savings of effort defending bills), etc., the court could meet § 330's mandate of competitive incomes by compensating the attorney for the excess average time spent preparing fee applications to satisfy the bankruptcy court over the average time spent on preparing bills for similar services for comparable non-bankruptcy clients. *Cf. Pawlak v. Greenawalt,* 713 F.2d 972 at 983 (3rd Cir.1983) ("[I]f attorneys are required to litigate for their fees but are not compensated for the time spent on such litigation, their effective rates will be reduced correspondingly.").
Of course, to prevent "double counting," the fee applicant would not also be able to include in his or her hourly rate an extra (in comparison to non-bankruptcy attorneys) overhead charge based on time spent preparing bankruptcy fee applications. The foremost aspiration of § 330 is that bankruptcy attorneys earn neither less, nor more, than their non-bankruptcy counterparts. *See In re Manoa Fin. Co.,* 853 F.2d 687, 691 (9th Cir.1988).

record to facilitate appellate review. *See, e.g., In re Paul,* 141 B.R. at 302; *In re Conston Corp.,* No. 91–7176, 1992 WL 55694, at *1–*2 (E.D.Pa. Mar. 17, 1992); *In re Rusty Jones,* 134 B.R. at 333; *In re Paster,* 119 B.R. 468, 470 (E.D.Pa.1990); *cf. Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) (plurality). We trust that throughout this process the UST will, when the trustee considers it appropriate, file comments with the court.

## III. THE QUESTION OF "CLERICAL SERVICES," AND THE STANDARD FOR ASSESSING THE REASONABLENESS OF FEES

### A. *Introduction*

 The district court determined that certain enumerated services were clerical in nature, and then disallowed remuneration therefor on the basis that, as a matter of law, *all* clerical services are included as overhead in attorneys' fees.[18] We disapprove of any approach that allows a court confronted with undisputed, credible, contrary evidence of market practices in the record to rely solely on its own judgment to designate services as either clerical or paraprofessional and to allow or disallow compensation for those services on the basis of such designation alone. As we demonstrate below, the principal purpose of the 1978 amendments to § 330 was to compensate bankruptcy attorneys at the same level as non-bankruptcy attorneys. The clearest path to that goal is to rely on the market, subject to the modification that the court will, in practical terms, act as a surrogate for the estate, reviewing

the fee application much as a sophisticated non-bankruptcy client would review a legal bill. This modification is driven by the fact that, realistically speaking, the legal market functions imperfectly in bankruptcy, as the debtor "client" and other interested parties are often unable or unwilling to contest the fees charged. *See supra* at 842–43. The most remarkable impact of market reliance under § 330 is that the court's review of fee applications becomes primarily an exercise in fact-finding, with relatively little room for the application of inflexible legal rules.

### B. *The Teachings of the Statutory Text and Legislative History*

 Section 330(a) on its face does not set up a bar to compensation for clerical services and, moreover, does not even by its terms differentiate clerical from non-clerical services. Instead, the statute focuses on *who* performs a service, and expressly provides that a court may award reasonable compensation for all actual, necessary services performed by the designated eligible fee award recipients (professionals and their paraprofessionals).[19] In drafting the statute to describe the covered services as "actual" and "necessary," Congress chose not to add the further qualifier that these services also be "professional" or "non-clerical" in nature. Instead, the statute provides that, once having determined the service provider is an eligible recipient, the amount of the compensation—its reasonableness—is to be "based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title." 11 U.S.C.A.

---

**18.** Although, as presaged *supra* at 840, the district court did cite two cases remunerating a fee applicant for clerical services (*In re Wolverine Knitting Mills, Inc.,* 107 B.R. 546, 547 (Bankr. E.D.Mich.1989) and *In re Miguel,* 123 B.R. 634, 637, 640 (Bankr.E.D.Cal.1991)), it distinguished those cases without explanation, apparently on the ground that it may be customary for trustees and accountants (the types of professionals with which those cases dealt), but not attorneys, to bill for clerical services separately rather than incorporate them into overhead. Mem. op. at 8.

**19.** Not being confronted with the question, we express no view about whether legal secretaries can be deemed "paraprofessionals" within the

meaning of § 330(a). We do note, though, that the Supreme Court has intimated that the term "reasonable *attorney's* fee" may encompass separate charges for secretarial services. *See Missouri v. Jenkins,* 491 U.S. 274, 287 n. 9, 109 S.Ct. 2463, 2471 n. 9, 105 L.Ed.2d 229 (1989) ("The safeguard against the billing *at a profit* of secretarial services ... is the discipline of the market." (emphasis added)); *id.* at 288 n. 10, 109 S.Ct. at 2471 n. 10 ("[P]urely clerical or secretarial tasks should not be billed *at a paralegal rate,* regardless of who performs them." (emphasis added)). Of course, even if legal secretaries are included within the term paraprofessionals, the market may not compensate firms for the sorts of services legal secretaries perform.

§ 330(a)(1) (1993), *quoted supra* at 840 n. 5. Thus we think the statute plainly specifies that the type of service performed by a paralegal (including whether it is clerical) affects the *rate* of compensation, not compensability *vel non. Cf. Baughman v. Wilson Freight Forwarding Co.*, 583 F.2d 1208, 1217 (3d Cir.1978). Neither the bankruptcy nor the district court in this case advanced a reason for departing from the plain import of this statute, and we have uncovered no persuasive reason to do so.[20] *Cf. Union Bank v. Wolas,* —— U.S. ——, ——, 112 S.Ct. 527, 531, 116 L.Ed.2d 514 (1991) (interpreting § 547(c) of the Code).

As just stated, the type of service affects the reasonableness of the rate of compensation sought by a professional or paraprofessional under § 330(a). Of the five factors enumerated in the statute as bearing on the reasonableness of the compensation, all but one take into account the categorization of the service as clerical or paraprofessional: the (i) nature, (ii) extent, and (iii) value of the services, and (iv) the cost of comparable services. We think that although each factor enumerated by § 330(a) retains independent significance, the cost of comparable services factor has an overarching role to act as a guide to the value of the services rendered given their nature and extent. In combination, these four factors—with the principal emphasis being on the cost of comparable services (market rates)—essentially provide the basis for computing the "reasonable hourly rate" used in the "lodestar" calculations familiar to fund-in-court cases and statutory fee-shifting provisions.[21] *See generally* Third Circuit Task Force, *Court Awarded Attorney's Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237 (1985).

The remaining § 330(a) factor—the time spent on such services—is a sibling of the lodestar approach's reasonable hours component. Thus, according to the market approach we believe that the Code dictates, *cf. Missouri v. Jenkins,* 491 U.S. 274, 283, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989) ("[A]ttorney's fees awarded under [fee-shifting] statute[s] are to be based on market rates for the services rendered."), the bankruptcy court should review fee applications not for whether each particular service undertaken by a paralegal is clerical or paraprofessional by nature, but for whether non-bankruptcy attorneys typically charge and collect from their clients fees for that particular service when performed by a member of that profession, and the rates charged and collected therefor.

The legislative history of § 330, which stems from the Bankruptcy Reform Act of 1978, P.L. No. 95–598, 92 Stat. 2549 (1978), rather than counseling a departure from the statute's plain object, amply reinforces it. The unambiguous policy inspiring § 330(a), expressed most clearly in the House Report accompanying House Bill 8200, H.R. 8200, 95th Cong., 1st Sess. (1977), is that professionals and paraprofessionals in bankruptcy cases should earn the same income as their non-bankruptcy counterparts. *See* H.R.REP. No. 595, 95th Cong., 1st Sess. 330 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6286.[22] The history nowhere speaks of com-

---

**20.** We understand that this Court stated in *In re Meade Land & Dev. Co.*, 527 F.2d 280, 284 (3d Cir.1975) that "non-legal services are not compensable." That opinion was decided before the 1978 Act, when under the Bankruptcy Act of 1898 the principle of economy of the estate rather than the cost of comparable services was the foremost consideration. *See infra* 849–51 & nn. 23 & 24.

**21.** The most familiar formula courts in this circuit use to calculate attorneys' fees is undoubtedly the "lodestar" approach, an approach with its roots in common fund cases and fee-shifting statutes. Under the lodestar analysis, a court first establishes a reasonable hourly rate (corresponding to the value of the services and the cost of comparable services in § 330(a)(1)) for each set

of compensable services (corresponding to the nature of the services in § 330(a)(1)), and then multiplies each rate by the reasonable number of hours of compensable work included in each respective set (corresponding to the time and extent of the services in § 330(a)(1)). *Cf. Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (plurality).

**22.** We include the House Committee on the Judiciary's full explanation of § 330(a):

Section 330 authorizes compensation for services and reimbursement of officers of the estate. It also prescribes the standards on which the amount of compensation is to be determined. As noted above, the compensation allowable under this section is subject to

pensating professionals or paraprofessionals solely for those services which just a professional or paraprofessional can provide, but instead repeatedly refers to the billing practices of nonbankruptcy professionals, justified by the goal of retaining competent legal representation for the debtor. Congress rather clearly intended to "provid[e] sufficient economic incentive [to lure competent bankruptcy specialists] to practice in the bankruptcy courts." *In re McCombs,* 751 F.2d 286, 288 (8th Cir.1984). Congress determined, it appears, that on average the gain to the estate of employing able, experienced, expert counsel would outweigh the expense to the estate of doing so, and that unless the estate paid competitive sums it

could not retain such counsel on a regular basis. With this congressional determination we are in no position to quarrel.

It is true that, before the 1978 amendments, the Code favored economy of the estate over competitive compensation to debtors' attorneys. *See, e.g., In re Manoa Fin. Co.,* 853 F.2d 687, 689 (9th Cir.1988). Vestiges of this principle are found in the Senate Committee on the Judiciary's Report accompanying the pre-conference version of the 1978 amendments in the Senate, a report upon which the bankruptcy court in this case placed decisive reliance.[23] *See In re Busy Beaver,* 133 B.R. at 756; *accord In re Four Star Terminals,* 42 B.R. at 430. Yet besides the fact that the section of the Senate Report

the maxima set out in sections 326, 328, and 329. The compensation is to be reasonable, for actual necessary services rendered, based on the time, the nature, the extent, and the value of the services rendered, and on the cost of comparable services other than in a case under the bankruptcy code. The effect of the last provision is to overrule *In re Beverly Crest Convalescent Hospital, Inc.,* 548 F.2d 817 (9th Cir.1976, as amended 1977), which set an arbitrary limit on fees payable, based on the amount of a district judge's salary, and other, similar cases that require fees to be determined based on notions of conservation of the estate and economy of administration. If that case were allowed to stand, attorneys that could earn much higher incomes in other fields would leave the bankruptcy area. Bankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously, would be driven elsewhere, and the bankruptcy field would be occupied by those who could not find other work and those who practice bankruptcy law only occasionally almost as a public service. Bankruptcy fees that are lower than fees in other areas of the legal profession may operate properly when the attorneys appearing in bankruptcy cases do so intermittently, because a low fee in a small segment of a practice can be absorbed by other work. Bankruptcy specialists, however, if required to accept fees in all of their cases that are consistently lower than fees they could receive elsewhere, will not remain in the bankruptcy field.

This subsection provides for reimbursement of actual, necessary expenses. It further provides for compensation of paraprofessionals employed by professional persons employed by the estate of the debtor. The provision is included to reduce the cost of administering bankruptcy cases. In nonbankruptcy areas, attorneys are able to charge for a paraprofessional's time on an hourly basis, and not include it in overhead. If a similar practice does

not pertain in bankruptcy cases, then the attorney will be less inclined to use paraprofessionals even where the work involved could easily be handled by an attorney's assistant, at much lower cost to the estate. This provision is designed to encourage attorneys to use paraprofessional assistance where possible, and to insure that the estate, not the attorney, will bear the cost, to the benefit of both the estate and the attorneys involved.

H.R.Rep. No. 595 at 329–30, *reprinted in* 1978 U.S.C.C.A.N. at 6286.

23. That report provided in pertinent part:

[E]conomy in administration is the basic objective....

The reference to "the cost of comparable services" in a nonbankruptcy case [in § 330] is not intended as a change of existing law. In a bankruptcy case fees are not a matter for private agreement. There is inherent a "public interest" that "must be considered in awarding fees," *Massachusetts Mutual Life Insurance Co. v. Brock,* 405 F.2d 429, 432 (C.A.5 1968), *cert. denied,* 395 U.S. 906 [89 S.Ct. 1748, 23 L.Ed.2d 220] ([1969]). An allowance is the result of a balance struck between moderation in the interest of the estate and its security holders and the need to be "generous enough to encourage" lawyers and others to render the necessary and exacting services that bankruptcy cases often require, *In re Yale Express System, Inc.,* 366 F.Supp. 1376, 1381 (S.D.N.Y. 1973). The rates for similar kinds of services in private employment is one element, among others, in that balance. Compensation in private employment noted in subsection (a) is a point of reference, not a controlling determinant of what shall be allowed in bankruptcy cases.

S.Rep. No. 989, 95th Cong., 2d Sess. 40 (1978) (footnote omitted), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5826.

espousing the outmoded notion of economy of the estate is fundamentally at odds with both the House Report *and* the text of the amended statute, the Senate itself in later debate expressly and forcefully rejected that portion of its earlier report, meaning that a court should not rely on it as authority at all.[24]

Some bankruptcy courts have justified departures from the statute's transparent mandate on the ground that preserving the debtor's estate is of greater import than compensating attorneys for their paralegals' fees. Were the statute's meaning and purpose ambiguous, we might find room to agree with them. But here Congress has unmistakably and expressly made a policy choice favoring full compensation for debtors' attorneys over greater proportionate compensation to the debtors' creditors, and when in our constitutional republic a statute is constitutional, courts are not at liberty to substitute their favored policies for those Congress enacts, no matter how unwise the court finds them to be.[25]

In conclusion, the classification of services as clerical or non-clerical does not decide the question of compensability under § 330: clerical services may be compensated

in the proper context. *See In re Wolverine Knitting Mills, Inc.*, 107 B.R. 546, 547 (Bankr.E.D.Mich.1989) (compensating accountant for clerical services after applicant demonstrated it had long billed clerical time to all its clients); *In re Stanley*, 120 B.R. 409, 415 (Bankr.E.D.Tex.1990) (holding clerical services are compensable if properly documented); *cf. In re First Software Corp.*, 79 B.R. 108, 119, 123 (Bankr.D.Mass.1987) (awarding a paralegal reduced compensation for checking the docket and court dates, ordering and obtaining documents from court, delivering papers, updating files, running errands, making telephone calls, and directing mail). We reiterate that the factors which § 330(a) prescribes primarily affect the *magnitude* of compensation for such services, whether rendered by a professional or paraprofessional.

C. *The Application of the Market Approach to the Role of Paralegals in Bankruptcy Proceedings*

The past two decades have witnessed a remarkable transformation of the legal market, converting once loyal and steadfast clients into sophisticated consumers of legal

24. Specifically, the Joint Explanatory Statement read by the respective floor managers in each chamber of Congress provided in this regard:

Section 330(a) contains the standard of compensation adopted in H.R. 8200 as passed by the House rather than the contrary standard contained in the Senate amendment.... [B]ankruptcy legal services are entitled to command the same competency of counsel as other cases. In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title [11] at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title [11]. *Contrary language in the Senate report accompanying S. 2266 is rejected,* and *Massachusetts Mutual Life Insurance Company v. Brock,* 405 F.2d 429, 432 (5th Cir.1968) is overruled. Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.
124 Cong.Rec. 33,994 (1978) (Joint Explanatory Statement) (remarks of Sen. DeConcini) (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. 6505, 6511. The slight differences between the Senate and House versions of the Joint Explanatory Statement are not manifested in the above excerpt, see the identical language at 124 Cong.Rec.

32,394–95 (1978) (Joint Explanatory Statement) (remarks of Rep. Edwards), *reprinted in* 1978 U.S.C.C.A.N. 6436, 6442. We accord the Joint Explanatory Statement the weight due a conference report, as in this instance the statement fulfilled that role. *See* 124 Cong.Rec. 32,392 (1978) (Joint Explanatory Statement) (remarks of Rep. Edwards), *reprinted in* 1978 U.S.C.C.A.N. at 6437; 124 Cong.Rec. 33,992 (1978) (Joint Explanatory Statement) (remarks of Sen. DeConcini), *reprinted in* 1978 U.S.C.C.A.N. at 6505–06.

25. *See, e.g., Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 194–95, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978) ("Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of a veto."); *cf. Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 748, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539 (1975) ("[I]f Congress ha[s] legislated the elements of a private cause of action for damages, the duty of the Judicial Branch [is] to administer the law which Congress enacted; the Judiciary may not circumscribe a right which Congress has conferred because of any disagreement it might have with Congress about the wisdom of creating so expansive a liability.").

products in a competitive legal marketplace. A critical component of this transformed legal market is the incorporation of paralegals providing a wide range of legal services into the law firm tapestry, a component brought about by the cost-effectiveness of employing an intermediate level of professional to handle matters beyond the ken of the average legal secretary but not demanding the full education, experience, or skill of a licensed attorney. *See, e.g.,* New Jersey State Bar Ass'n, *The Evolving Role of the Paralegal* 12 (1991). The availability of paralegals is a positive development from the point of view of conserving the debtor's estate, and we expect that, when feasible, members of the bar representing debtors will engage paralegals and other support staff when they are able to render legal services efficiently yet effectively, with the objective of alleviating the diminution of the estate's assets. *See, e.g., In re Temple Retirement Community,* 97 B.R. at 339; H.R.Rep. No. 595 at 330, *reprinted in* 1978 U.S.C.C.A.N. at 6286; S.Rep. No. 989 at 41, *reprinted in* 1978 U.S.C.C.A.N. at 5827.

■ The bankruptcy court was concerned that the tasks for which K & L charged for its paralegals' time did not require the exercise of professional judgment, and that compensation for such services would unfairly burden the estate. As is true with recently graduated attorneys, entry-level paralegals perform the more mundane tasks in the paralegal work spectrum, some of which may resemble those tasks generally deemed "clerical" in nature. Yet even with these tasks, paralegals may have to bring their training or experience to bear, thereby relieving attorneys of the burden of extensive supervision and ensuring the proper completion of tasks involving the exercise, *or potential exercise,* of some paraprofessional judgment. Of course, the appropriate rate the attorney will command for paralegal services will ordinarily parallel the paralegal's credentials and the degree of experience, knowledge, and skill the task at hand calls for. *See infra* at 855 n. 34; *cf. Jenkins,* 491 U.S. at 288, n. 10, 109 S.Ct. at 2471 n. 10 ("*[P]urely* clerical or secretarial tasks should not be billed *at a paralegal rate,* regardless of who performs them." (emphasis added)). The short of it is that the market-driven approach of § 330 permits compensation for relatively low-level paralegal services if and only if analogous non-bankruptcy clients agree to pay for the same, and then only at that rate.[26]

The bankruptcy court held that clerical services—those services not requiring the exercise of professional legal judgment—must be included in "overhead."[27] *See* 133 B.R. at 756. We cannot agree that in all cases the general ability of a legal secretary to perform some particular task determines whether a paralegal or a legal secretary is the appropriate, read most efficient, employee to perform it at any given instant. At times temporal constraints may foreclose the delegation option. At other times a paralegal—or, for

---

**26.** K & L contends, as does *amicus curiae* the National Federation of Paralegal Associations, Inc., that the types of services the district court disallowed are the types of services for which paralegals are trained and that they are within the scope of paralegal's responsibilities as defined by National Federation of Paralegal Associations, Inc., *Paralegal Responsibilities* at 1–2. Br. for Appellant at 23 n. 9, 35; Br. for *Amicus Curiae* National Federation of Paralegal Assocs., Inc. at 11. But this contention misses the point, for the germane question under § 330 is not what types of services an institution or an expert believes is proper for a paraprofessional to perform, but rather is what types of services the non-bankruptcy market recompenses a paraprofessional for.

**27.** Overhead for purposes of bankruptcy reimbursement has been defined as "all continuous administrative or general costs or expenses incident to the operation of the firm which cannot be attributed to a particular client or case." *In re Wildman,* 72 B.R. 700, 731 (Bankr.N.D.Ill.1987). Without adopting or rejecting that definition (as we think a market inquiry, not a legal definition, is the cornerstone of compensability and hence the discernment of which items and services a law firm may charge for, *see In re Miguel,* 123 B.R. 634, 637 (Bankr.E.D.Cal.1991) ("Understanding the fee structure of the industry, and of the individual practitioner, is critical to determining how the overhead expenses are included and recovered.")), we observe that it would exclude from overhead, for example, secretarial services whenever the secretary could attribute his or her time to particular clients. This would be true for a great many secretarial services, including typing, filing, and photocopying, as there is no reason to think a secretary cannot log his or her time just as well as can an attorney.

that matter, an attorney—can more productively complete a clerical task, such as photocopying documents, than can a legal secretary.

For example, the combination of the paralegal's effort in retaining and instructing a legal secretary with the legal secretary's effort in performing the task may exceed the paralegal's effort in performing the task alone.[28] Or, a legal secretary may lack the judgment needed in selecting and collating the documents to copy, and the expense of having a paralegal or attorney first instruct the legal secretary and then review his or her work for thoroughness and accuracy combined with the legal secretary's time (albeit subsumed within overhead) may exceed the expense of having the paralegal or attorney personally perform the task in the first place. Or, a legal secretary may simply be unavailable in time to meet a pressing deadline.[29] Generally speaking, attorneys commonly perform intermittent tasks not calling for their particular level of expertise, and nonetheless present non-bankruptcy clients with bills reflecting a single ("blended") hourly rate. *See In re Vogue*, 92 B.R. at 718–19.

■ In keeping with the market approach, it is critical that courts allow attorneys the same leeway in the types of tasks billed for at their (and their paralegals') established rate as non-bankruptcy clients permit their attorneys (and their attorneys' paralegals), or Congress' manifest intent to provide fully competitive income to bankruptcy attorneys would be transgressed. *Cf. Jenkins*, 491 U.S. at 287, 109 S.Ct. at 2471. A bankruptcy judge, typically far removed from the economics of law practice and the exigencies of making recurring business judgments about the most prudent and cost-effective method for performing a given task with adequate assurances of quality in a developing, competitive legal market, is generally not well-equipped to review subjectively the law firm's allocation of responsibilities and billing practices.

■ Like any sophisticated consumer of legal services, the bankruptcy court should compare the costs of "equivalent" practitioners of the art (including their billing structures) as well as the applicant's billing practices with "equivalent" clients. Which legal or paralegal services are properly included as the overhead of attorneys' fees, then, are presumably reflected accurately in the services for which attorneys charge their non-bankruptcy clients.[30] The market billing

---

**28.** The cost of having the legal secretary perform the task is relevant even when not itemized and separately billed to the client because an improvement in overall productivity accomplished by efficiently allocating tasks between the various occupations employed in a law firm will reduce overall secretarial labor costs and, in an efficient market, correspondingly reduce the overhead component for secretarial labor in that firm's attorneys' fees.

**29.** Indeed, K & L contends that some of the disallowed paralegal services illustrate precisely this point. In particular, it argues that the bankruptcy court entered numerous interim orders at the commencement of Busy Beaver's petition authorizing Busy Beaver to continue its day-to-day operations—orders pertaining to the use of cash collateral, the continuation of customer policies, the payment of pre-petition wages and employee benefits, the ability to honor pre-petition deposits and credit card charge backs, the retention of counsel, etc.—and directed K & L to serve the interim motions and related orders overnight on various creditor groups composed of up to 120 creditors. K & L argues that "[i]n order to comply timely with the Bankruptcy Court's direction, the paralegal's role was to ensure that

the appropriate pleadings and orders were served upon the creditors to whom the Bankruptcy Court had directed service to be made," that "[c]ollating the appropriate documentation involved the paralegals providing services which had intertwined professional and clerical components," and that "[t]he critical timing and need to ensure compliance with service requirements would not have permitted the delegation of the responsibilities *solely* to legal secretaries." Br. of Appellant at 7.

**30.** We find that the Supreme Court's reasoning concerning compensation for paralegals under civil rights fee-shifting statutes transfers smoothly to the bankruptcy context:

All else being equal, the hourly fee charged by an attorney whose rates include paralegal work in her hourly fee, or who bills separately for the work of paralegals at cost, will be higher than the hourly fee charged by an attorney competing in the same market who bills separately for the work of paralegals at "market rates." In other words, the prevailing "market rate" for attorney time is not independent of the manner in which paralegal time is accounted for. Thus, if the prevailing practice

practices include not only whether comparable non-bankruptcy firms typically charge the particular task to their clients as paralegal services, but the market rate at which such services are provided. *See Lindy Bros. Builders, Inc. v. American Radiator & Std. Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973) (*"Lindy I"*) (stating "the court may find that the reasonable rate of compensation [for the same person] differs for different activities"), *appeal after remand*, 540 F.2d 102 (3d Cir.1976) (in banc) (*"Lindy II"*); *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 591 (3d Cir.1984) (same).

◼ Although this case does not present us with a pressing need to define precisely how a bankruptcy court should verify the market rates, if any, for select clerical services, we observe that certainly a bankruptcy judge's experience with fee petitions and his or her expert judgment pertaining to appropriate billing practices, founded on an understanding of the legal profession, will be the *starting point* for any analysis.[31] By starting point we mean to suggest that a bankruptcy judge should use his or her experience and expertise to locate the questionable charges and fees, and once having questioned a charge or fee may properly require the

applicant to meet the burden to prove the market would recompense him or her for that charge.

◼ Then the court should carefully consider relevant, competent evidence submitted with the fee application, provided as a supplement to the fee application, or presented at a hearing, *see supra* Part II.B, even if the evidence directly contradicts the court's own judgment. *See In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir.1992) ("Markets know market values better than judges do.").[32] Of course, if the bankruptcy court discounts any evidence presented by the fee applicant, *see In re York Int'l Bldg., Inc.*, 527 F.2d 1061, 1068 (9th Cir.1975) (stating that courts "are themselves experts on the value of services rendered in a bankruptcy proceeding and are not bound by the evidence offered"); *Brown v. Culpepper*, 561 F.2d 1177, 1177–78 (5th Cir.1977) (per curiam) (same), the court should to the extent practicable make findings of fact and provide reasoned explanations in the record to facilitate review, *see, e.g., In re Rusty Jones, Inc.*, 134 B.R. 321, 333 (Bankr.N.D.Ill.1991).

◼ As another basis for adjudging the reasonableness of charges for services, upon

---

in a given community were to bill paralegal time separately at market rates, fees awarded the attorney at market rates for attorney time would not be fully compensatory if the court refused to compensate hours billed by paralegals or did so only at "cost." Similarly, the fee awarded would be too high if the court accepted separate billing for paralegal hours in a market where that was not the custom. *Jenkins*, 491 U.S. at 286–87, 109 S.Ct. at 2471 (footnote omitted); *see In re Temple Retirement Community*, 97 B.R. at 342; *In re Four Star Terminals, Inc.*, 42 B.R. 419, 426 n. 1 (Bankr.D.Alaska 1984) ("[T]hose law firms who bill for such items as secretarial time and file maintenance by paralegals may expect to find their hourly rates reduced to take into account the reduction in their out-of-pocket expenditures for overhead."). A witness at the April 16 evidentiary hearing testified to as much, reasoning that if paralegal services were not billed to particular clients, the attorneys' hourly rate would increase and some clients would indirectly pay for paraprofessional services incurred by other clients, who would pay too little for the services they received. In a competitive legal market, a specific firm's practices will often prove the best guide regarding which services are subsumed in

the attorneys' fees as overhead and which are not.

**31.** *See, e.g., In re Patronek*, 121 B.R. 728, 730–31 (Bankr.E.D.Pa.1990); *In re Kroh Bros. Dev. Co.*, 105 B.R. 515, 520 (Bankr.W.D.Mo.1989); *In re Carter*, 101 B.R. 170, 172 (Bankr.D.S.D.1989); *In re Gulf Consol. Servs.*, 91 B.R. 414, 415 (Bankr.S.D.Tex.1988); *In re Pothoven*, 84 B.R. 579, 583 (Bankr.S.D.Iowa 1988).

**32.** Judge Posner, who penned *In re Continental Illinois Securities Litigation*, wrote in the context of reversing a district court for discounting attorneys' hourly rates from those that the attorneys regularly billed:

It is apparent what the district judge's mistake was. He thought he knew the value of the class lawyers' legal services better than the market did.... He may have been right in some ethical or philosophical sense of "value" but it is not the function of judges in fee litigation to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order.

962 F.2d at 568.

appointment or selection of the debtor's counsel a bankruptcy court might request that counsel provide the court with a confirmed, detailed schedule of fees which counsel actually charges to bankruptcy clients, and where possible to non-bankruptcy clients as well, including the types of paralegal services for which he or she bills and the rates therefor, before he or she commences representing the debtor. *See* 11 U.S.C.A. § 329(a) (1993).[33]

■ We understand that even under this market-driven framework, some services paralegals now perform at some firms may go uncompensated. K & L argues that in those cases economic considerations will drive firms to have attorneys perform the disallowed tasks. Both the district and bankruptcy courts rejected this argument, explaining that if a service is not compensa-

ble to a paralegal, it most likely will also not be compensable to an attorney. We entirely agree with that conclusion. At least absent justifying circumstances (such as time pressures not brought on by a lack of diligence, the excusable non-availability of a less experienced employee, or an inability to delegate the task efficiently, perhaps because the learning curve renders effective delegation infeasible), "[w]hen an experienced attorney does clerk's work, he or she should be paid clerk's wages." *In re Vogue*, 92 B.R. at 718.[34] Section 330(a) is not coy about this matter, but states expressly that how much compensation is reasonable depends on the nature and value of the services, as measured by the cost of comparable services.

■ Finally, because § 330(a) does not entitle debtors' attorneys to any *higher* compensation than that earned by non-bank-

---

**33.** That section provides in relevant part:

Any attorney representing a debtor in a case under this title, or in connection with such a case, ... shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney
....

11 U.S.C.A. § 329(a) (1993).

**34.** *See, e.g., In re Office Prods. of America, Inc.*, 136 B.R. 964, 977 (Bankr.W.D.Tex.1992) (reducing billing rate for attorney who delivered documents); *In re Oakes*, 135 B.R. 511, 514 (Bankr. N.D.Ohio 1991) (compensating counsel at paralegal rates for tasks which a paralegal or an office staff member could perform); *In re Ginji Corp.*, 117 B.R. 983, 993–94 (Bankr.D.Nev.1990) (same); *In re Amatex Corp.*, 70 B.R. 624, 627 (Bankr.E.D.Pa.1985) (same); *In re Associated Grocers of Colo., Inc.*, 137 B.R. 413, 425 (Bankr. D.Colo.1990) (holding only a party with the necessary level of experience should perform a given task and compensation should consequently be set at that level); *In re Rusty Jones, Inc.*, 134 B.R. 321, 334 (Bankr.N.D.Ill.1991) (same); *In re Belknap, Inc.*, 103 B.R. 842, 845 (Bankr.W.D.Ky. 1989) (importing senior partners not to perform services "which could be as competently performed by associates or paralegals"); *In re Pothoven*, 84 B.R. 579, 585 (Bankr.S.D.Iowa 1988) ("[W]ork done by a senior partner that a beginning associate or paralegal could do will be compensated at a lower rate."); *In re Malden Mills, Inc.*, 42 B.R. 476, 481 (Bankr.D.Mass.

1984) (reducing attorney's fees because experienced counsel charging high rates should delegate tasks not requiring his or her sophistication to junior, less expensive attorneys—"counsel cannot be paid expert rates for routine services"); *cf. Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*, 762 F.2d 272, 279 (3d Cir.1985) (awarding able and experienced counsel fees under the Clean Air Act at paralegal rates for work which was "mundane or minor in character"), *modified*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 591–93 (3d Cir.1984) (awarding partners compensation under the equitable fund doctrine in a class action at an associate attorney level for "tasks which are customarily performed by junior associates or paralegals"); *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir.1983) (statutory fee case under ERISA) ("Nor do we approve the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals or less experienced associates. Routine tasks, if performed by senior partners in large firms, should not be billed at their usual rates. A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn."); *In re Meade Land & Dev. Co.*, 527 F.2d at 285 (stating an attorney is entitled to compensation only for services which "could colorably constitute the type of services one would reasonably expect an attorney to perform under the circumstances"); *Cohen & Thiros*, 44 B.R. at 573 ("[M]inisterial legal work is compensated at rates lower than truly legal service."); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir.1974) ("[N]onlegal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it.").

ruptcy attorneys, *In re Manoa Fin. Co.*, 853 F.2d at 690, the court should review a fee application to ensure the applicant exercises the same "billing judgment" as do non-bankruptcy attorneys by, for example, writing off unproductive research time, duplicative services, redundant costs precipitated by overstaffing, or other expenses with regard to which the professional generally assumes the cost as overhead in corresponding non-bankruptcy matters, or for which analogous non-bankruptcy clients typically decline to pay. *See* 11 U.S.C.A. § 330(a) (allowing a court to award compensation for "actual, necessary services"); *In re Automobile Warranty Corp.*, 138 B.R. 72, 79 (Bankr.D.Colo.1991); *cf. Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939–40 (plurality).[35]

■ While bankruptcy fees are commonly calculated using the lodestar method, we note in closing that, contrary to the apparent view of the Sixth Circuit Court of Appeals, *see In re Boddy*, 950 F.2d 334, 337 (6th Cir.1991), § 330 by no means ossifies the lodestar approach as the point of departure in fee determinations. We refer to it here because the product of an hourly rate by the number of hours worked to this day remains the overwhelmingly prevailing billing method within the market for most legal services. But with the rise of competitive pressures and the ceaseless evolution of the legal community, we may expect to witness law practitioners adapt to the changed circumstances by developing alternative billing practices and methods.[36] The strength of the market approach Congress embraced with § 330 is that these developments, including regional variations, will automatically percolate up through bankruptcy fee allotments. While § 330 is not an engine for implementing innovative billing strategies, it will readily accommodate alternative practices once comfortably established in the realm of comparable non-bankruptcy legal services.

## IV. CONCLUSION

Because neither the bankruptcy court nor the district court applied the correct legal standard, the district court's opinion and order will be vacated and the case remanded to the district court with directions to remand to the bankruptcy court with instructions to reconsider K & L's initial fee application in light of the foregoing opinion.

---

**35.** The aforementioned principle of responsible billing applies not only to the selection of which classification of employee within a law firm should perform a given task, but also to what genre of law firm should represent the debtor. A run-of-the-mill bankruptcy case does not warrant the lofty fees of nationally-renowned law firms, *see In re Vogue*, 92 B.R. at 718, and a reasonable debtor concerned with the economical administration of the estate in such a case would refrain from retaining over-qualified counsel. In other words, the reasonable hourly rate has a cap based on the expected and actual complexity of the case, a cap which, while flexible, should stave off clear abuses. *Compare In re Waldoff's Inc.*, 132 B.R. 329, 335 (Bankr.S.D.Miss.1991) (substantially reducing out-of-state counsel's fees to match prevailing local rates because the complexities of the case did not warrant retention of a law firm charging counsel's requested rates) *and In re Casull*, 139 B.R. 525, 528 (Bankr.

D.Colo.1992) (reducing fees found excessive "considering the nature and complexity of the issues dealt with") *with In re Robertson Cos.*, 123 B.R. 616, 619 (Bankr.D.N.D.1990) (awarding out-of-state law firm its locally prevailing rate, which far exceeded local bankruptcy rates, in light of the size and complexity of the case) *and In re Frontier Airlines, Inc.*, 74 B.R. 973, 976–77 (Bankr.D.Colo.1987) (same). To be fair to the professional, the court should dispose of this problem as early as practical, preferably before the debtor retains the professional.

**36.** *See generally* Robert E. Litan & Steven C. Salop, *Reforming the Lawyer–Client Relationship Through Alternative Billing Methods*, Judicature, Jan.–Feb. 1994, at 191; Steven Brill, *Replacing the Hourly Rate*, Am. Law., Sep. 1992, at 6; Deborah Graham, *Billing Methods: Firms Begin to Tinker*, Legal Times, May 20, 1985, at 1.