### In re: NORTHWESTERN CORPO-RATION, Reorganized Debtor.

### No. 03–12872(JLP).

United States Bankruptcy Court, D. Delaware.

May 5, 2005.

William E. Chipman, Jr., Wilmington, DE, for Debtor.

## MEMORANDUM OPINION WITH RESPECT TO FINAL FEE APPLICATION OF LAZARD FRÈRES & CO. LLC[1]

JOHN L. PETERSON, Bankruptcy Judge.

After due notice, hearing on the Final Fee Application of Lazard Frères & Co. LLC ("Lazard") was held on April 5, 2005. Testimony was submitted by Lazard's Managing Director, Andrew Yearly, and Exhibit 1 was entered into evidence.[2] The Final Fee Application seeks compensation and reimbursement of expenses for a period from September 14, 2003 through November 1, 2004 for services as financial advisor and investment banker to the debtor-in-possession in connection with the Debtor's chapter 11 reorganization. No objections to the Final Fee Application have been filed by any party-in-interest.

On October 10, 2003, this Court entered an order authorizing the employment of Lazard pursuant to sections 327(a) and 328(a) of the Bankruptcy Code[3] *nunc pro tunc* to the petition date (September 14, 2003) [Docket No. 199]. Lazard had been employed by the Debtor pre-petition, since May 20, 2003, to review and evaluate Debtor's business operations, liquidity, potential debt capacity and out-of-court and in-court restructuring alternatives, among other matters. Lazard was paid in full for their pre-petition services prior to the petition date.

The Application to Employ and attached Engagement Letter states "the Debtor has been advised that, fees and services rendered in these cases will be as follows:

a. A monthly fee in the amount of $200,000 payable in advance upon the 15th day of each month until the termination of the agreement";

b. A fee (the "Restructuring Fee") in the amount of $5.5 million payable upon the earlier of execution of definitive agreements with respect to a Restructuring and delivery of binding consents to such plan by a sufficient number of creditors and/or bondholders, as the case may be, to bind the creditors or bondholders, as the case may be to the Restructuring; ....

f. In addition to any fees that may be payable to Lazard and, regardless of whether any transaction occurs, the Debtor shall promptly reimburse Lazard for all: (i) reasonable out-of-pocket expenses (including travel and lodging, data processing and communications charges, courier services and

---

1. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

2. A copy of Exhibit 1 is attached to the Fee Auditor's Final Report regarding the Final Fee Application [Docket No. 2570] as Response Exhibits A and B.

3. Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code ("Code") 11 U.S.C. § 101 *et seq.*

other appropriate expenditures) and (ii) other reasonable fees and expenses of counsel, if any.

[Docket No. 39]. The Application to Employ acknowledged Lazard's restructuring expertise, the anticipated substantial commitment of professional time and effort required by Lazard in light of the fact that the retention may foreclose other consulting opportunities for Lazard (which were not specified) and that the actual time required may vary substantially from week-to-week or month-to-month. The Debtor agreed that the fee arrangements contained were reasonable under the standards set forth in section 328(a).

The Application to Employ noted that it is not the general practice of financial advisors and investment bankers to keep detailed time records similar to those customarily kept by attorneys. Lazard however agreed, as required by the Engagement Letter, that it would file with the Court interim and final fee applications with respect to its services "in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the 'Local Rules') and any applicable orders of the Court." These fee applications would include time records that set forth summary descriptions of the services rendered by each restructuring professional. Lazard also agreed to keep detailed records of its actual and necessary costs and expenses.

The Application to Employ requested retention under section 328(a), which Lazard claims enables the Debtor to retain professionals pursuant to specific fee arrangements to be determined at the time the Court approves retention, "subject to reversal only if the terms are found to be improvident in light of 'developments not capable of being anticipated at the time of the fixing of such terms and conditions.'" (Application to Employ, p. 14, citing *Donaldson, Lufkin & Jenrette Sec. Corp. v. National Gypsum Co. (In re National Gypsum Co.)*, 123 F.3d 861, 862–63 (5th Cir.1997)).

Attached to the Application to Employ was an affidavit of a Managing Director of Lazard, David S. Kurtz, which sets forth many of the statements contained in the Application to Employ. The affidavit also included a "conflict" statement, which stated Lazard had no conflicts of interest with any creditors, although some connection with common auditors, Deloitte & Touche, PG & E Equity Group and lending groups were noted.

Also attached to the Application to Employ was a proposed form of order, which was modified before signature by the Court on October 10, 2003 [Docket No. 199]. The Order granted the Application to Employ, employed Lazard pursuant to sections 327(a) and 328(a) as financial advisors "on the terms set forth in the Application," including the compensation language, "subject to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable orders of this Court . . . ." After ordering that Lazard shall file interim and final fee applications, which "shall be subject to this Court's approval," the proposed order was modified. The Order entered by the Court concluded:

ORDERED, that, notwithstanding anything to the contrary herein or in the Engagement Letter, all of Lazard's fees and expenses in this case, including without limitation the Restructuring Fee, the Sale Transaction Fee and the Financing Fee (each as defined in the Engagement Letter), shall be subject to approval by this Court under the standard set forth in Section 328(a) of the Bankruptcy Code, the Bankruptcy

Rules, the Local Rules and any other applicable orders of this Court; provided however; that the Restructuring Fee shall also be subject to approval by this court under the standard set forth in section 330(a) of the Bankruptcy Code; and it is further

ORDERED, that, during the pendency of this Chapter 11 case, this Court shall retain exclusive jurisdiction to construe and enforce the terms of the Application, the Engagement Letter, the Indemnification Letter and this order.

## A. *Fee Request*

Lazard's Final Fee Application requests an allowance of $8.1 million based upon flat fee of $200,000 per month for thirteen months and a Restructuring Fee of $5.5 million. While the Fee Auditor's report analyzed the requested fees under section 328(a), stating he could find no intervening improvident circumstances that triggered that provision of section 328(a),[4] the Fee Auditor recognized that Lazard's fees were subject to review and approval under section 330(a).

█ In light of the plain language of the Retention Order, which expressly demands that the Restructuring Fee shall be subject to approval under the standards of section 330(a), I deem it unnecessary to examine the improvidence issue set forth in section 328(a). Therefore, case authorities such as *In re Texas Securities, Inc.,* 218 F.3d 443 (5th Cir.2000) (citing *National Gypsum, supra* ), which hold that barring changed conditions a bankruptcy court may not compute a professional's

compensation under section 330(a) after the court approved a particular rate or means of payment under section 328, are simply inapplicable to the Restructuring Fee under the Retention Order. Rather, I follow the criteria established in *In re Stations Holding Co., Inc.,* 2004 WL 1857116 (Bankr.D.Del. August 18, 2004), where Chief Judge Walrath wrote:

> Bankruptcy courts have a duty to review the fee requests of professionals in chapter 11 cases. *See, e.g., In re Busy Beaver Bldg. Ctrs., Inc.,* 19 F.3d 833, 841 (3d Cir.1994). This duty protects the public interest by monitoring the Debtor's estate and ensuring that all fees assessed are reasonable in light of the benefits received. *Id.* "[A] bankruptcy judge's experience with fee petitions and his or her expert judgment pertaining to appropriate billing practices, founded on an understanding of the legal profession, will be the starting point for any analysis." *Id.* at 854. Under section 330, when determining the reasonableness of a fee request it is the responsibility of the court to consider: (i) the nature, extent, and value of the services provided; (ii) the time spent on the services provided; and (iii) the customary compensation for similar services provided. 11 U.S.C. § 330(a)(3).

*Id.* at *2. Under Section 330, as amended by the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, 108 Stat. 4106 (1994), the Court ultimately must determine whether the compensation to be awarded is "reasonable" for "actual, necessary ser-

---

4. Section 328(a) provides:

The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a

contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

vices" rendered by the professional. Subsection 330(a) provides, in pertinent part:

(3)(A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including -

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.[5]

(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for—

(i) unnecessary duplication of services; or

(ii) services that were not-

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.[6]

One example applying section 330 criteria to financial advisor fees in a utility reorganization is *In re Public Service Co. of New Hampshire*, 160 B.R. 404 (Bankr.D.N.H. 1993), an extraordinary case for detail, which compared the roles of two financial advisors. As to the first financial advisor, First Boston Corporation, the court found that advisor expended 18,070 hours at an implied rate of $197.58 per hour, which the court held was reasonable under section 330. *Id.* at 428–29. The court, however, denied First Boston's request for a $4.5 million "transaction fee" because that advisor contributed little to the ultimate sale of the debtor's assets. *Id.* at 436–37. Conversely, the court awarded a $1 million "enhancement fee" to the other financial advisor, Rothschild, Inc., because that advisor facilitated a sale that achieved a $500 million return for common and preferred stockholders, as opposed to the early possibility of no return to these creditor constituencies. *Id.* at 438–45.

A further example of a utility reorganization success is the case of *In re Pacific Gas and Electric Co.*, 304 B.R. 395 (Bankr. N.D.Cal.2004).[7] In *Pacific Gas*, the court confirmed a vigorously contested plan of reorganization that established a company with Regulatory Assets of $2,210 billion, which amortized rates over nine years, provided a return on equity of 11.22% per year for nine years, paid all creditors 100% on each claim, established an Investment Grade rating likely to raise $8.7 billion to fund the plan and reinstated preferred and common shareholders' equity interest in full. *Id.* at 401–02. The *Pacific Gas* plan also settled protracted, expensive and uncertain litigation, *id.* at 405 n. 13, which

---

**5.** *See In re Intelogic Trace, Inc.,* 188 B.R. 557 (Bankr.W.D.Tex.1995).

**6.** I note here that the Retention Order provides that Lazard may submit time records in summary format that set forth a description of the services rendered by each professional and the amount of time spent on each date by such professional, and thus Federal Rule of Bankruptcy Procedure 2016 and Local Rule 2016–2 "are modified and waived, to the extent necessary, with respect to Lazard."

**7.** This case is noted at page 6 n. 5 of Lazard's brief in support of the Final Fee Application [Docket No. 2914].

allowed cash payments to creditors. *See also In re Pacific Gas and Electric Co.,* (Cal.P.U.C.) 2004 WL 579352, at \*15–18 (2004) (detailing the specifics and reasonableness of the commission/utility settlement agreement). The above two utility cases are mentioned because they show the varying results of prominent chapter 11 reorganization efforts.

The Fee Auditor's final report also included a report on Lazard's Third, Fourth and Fifth Interim Fee Applications. The Fee Auditor noted that for the Fifth Interim Period, Lazard billed 88.1 hours and fees of $400,000, for an effective hourly rate of $4,994.32. As to the Restructuring Fee, the Fee Auditor noted pursuant to the language of the Court's Retention Order, the standards of section 328(a) should apply, however, the Fee Auditor was unaware of any basis for modifying the Restructuring Fee under section 328(a). The Fee Auditor then proceeded to analyze the Restructuring Fee under section 330(a), citing *In re Federal Mogul–Global, Inc.,* 348 F.3d 390, 396–97 (3d Cir.2003), for the proposition that a bankruptcy court is generally required to award an applicant a fee that is "reasonable" in light of certain factors set forth in section 330(a)(1). The Fee Auditor relied primarily on *In re UDC Homes, Inc.,* 203 B.R. 218 (Bankr.D.Del. 1996), where the court analyzed comparative data in determining the reasonableness of the financial advisor's fee. Lazard relies on the same comparative approach in this case. *See* Exhibit 1. In *UDC Homes,* the advisors provided the court with a list of thirty-two domestic transactions having a value between $200 and $500 million dollars, where the advisor was paid a percentage of the transaction value,[8] ranging from .5% to 1.5% and averaged at

.9%. *Id.* at 222–23. The advisors also provided the court with a list of thirty-one restructurings involving values from $102 million to $2.5 billion, where the average transaction fee was 1.09% of the transaction's accreted security value. *Id.* The *UDC Homes* Court concluded that the .72% sought by the advisors, based on the two benchmarks, satisfied the test of reasonableness within the standards set forth in *Busy Beaver. Id.* at 223.

The Fee Auditor thus made the legal conclusion that Lazard's approach is supported by *UDC Homes.* In response to the Fee Auditor's request, Lazard set forth examples of restructuring fees (called "Success Fees" in the response), which is identified as Exhibit 1 (Debtor Advisor Restructuring Fees), as a percentage of total funded debt for twelve restructurings averaging $1.9 billion (median $2.04 billion), with a fee of .30% to .32%, NorthWestern is included in the list at .25% based on a total funded debt of $2.2 billion. A second list of restructures, based on acquisitions (Exhibit "B") results in an average of $1,447.5 million with an average restructure fee of .6%. Lazard's witness conceded that NorthWestern's case did not involve a sale transaction.

Lazard's brief in support of the success fee parrots the same approach Lazard submitted to the Fee Auditor and submitted in evidence. The brief also cites *Busy Beaver* for the proposition that the "cost of comparable services factor has an overarching role to act as a guide to the value of the services rendered" in non-bankruptcy matters. 19 F.3d at 849. While Lazard quotes *Busy Beaver* as holding solely that "We disapprove of any approach that allows a court confronted with

---

8. *UDC Homes* involved a stock purchase agreement. 203 B.R. at 222–23. The comparative data at issue in *UDC Homes* analyzed domestic transactions during the period between January 1, 1992 through November 28, 1995, and restructuring fees during the during the period of March 1990 through the second quarter of 1995. *Id.*

undisputed, credible, contrary evidence of market practices in the record to rely solely on its own judgment . . . ," *id.* at 853, the *Busy Beaver* Court, like Judge Walrath in *Stations Holding,* was not so restrictive as to the Court's role when it held:

> Although this case does not present us with a pressing need to define precisely how a bankruptcy court should verify the market rates, if any, for select clerical services, we observe that certainly a bankruptcy judge's experience with fee petitions and his or her expert judgment pertaining to appropriate billing practices, founded on an understanding of the legal profession, will be the starting point for any analysis. By starting point we mean to suggest that a bankruptcy judge should use his or her experience and expertise to locate the questionable charges and fees, and once having questioned a charge or fee may properly require the applicant to meet the burden to prove the market would recompense him or her for that charge.

*Busy Beaver,* 19 F.3d at 854 (internal citations omitted). At this point, I am reminded of the age-old adage articulated by Judge Learned Hand in *U.S. v. Marzano,* 149 F.2d 923 (2d Cir.1945): "A judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert." *Id.* at 925. Moreover, lack of opposition by the Debtor, the Plan Committee or the Office of the U.S. Trustee (who has remained inert on all fee applications submitted to the Court), "does not absolve the Court of its responsibility to ensure that relief may be properly entered." *In re Central Idaho Forest Products,* 317 B.R. 150, 155 (Bankr.D.Idaho 2004). Indeed, *Busy Beaver* was quite explicit, citing Federal Rule of Bankruptcy Procedure 2017(b) and section 105 in holding:

> Beyond possessing the power, we think the bankruptcy court has a duty to

review fee applications, notwithstanding the absence of objections by the United States trustee ("UST"), creditors, or any other interested party, a duty which the Code does not expressly lay out but which we believe derives from the court's inherent obligation to monitor the debtor's estate and to serve the public interest. . . .

Indeed, section 330 shares with "fund-in-court" cases a salient feature—"the potential for conflicts of interest between the attorneys seeking compensation and their clients"—which imposes upon the bankruptcy court "an independent duty to scrutinize fee applications." . . .

Disagreeable as the chore may be, the bankruptcy court must protect the estate, lest overreaching attorneys or other professionals drain it of wealth which by right should inure to the benefit of unsecured creditors.

19 F.3d at 841–44.

■ Lazard takes issue with the decision in *Stations Holding,* stating that it is entirely distinguishable from the case *sub judice* because *Stations Holding* dealt with objections to the transaction fee, where in contrast, no party-in-interest has objected to Lazard's Restructuring Fee. I disagree and find *Stations Holding* as a guidepost for reviewing Lazard's Final Application.

Lazard concludes that "the fact that the Restructuring Fee was the result of arms'-length bargaining between two sophisticated parties with equal bargaining positions further evidences that the fee falls well within the market range." (Brief, p. 20). While Mr. Yearly opined the fee agreement between the parties was fairly negotiated, NorthWestern's negotiator was not called as a witness. I have no reason, however, to question Mr. Yearly's testimony on this issue. I do

note that NorthWestern was in deep financial trouble when it negotiated the fee arrangement with Lazard. Lazard further argues that a court's analysis success fees under section 330(a) is "market driven," but the court also "pay close attention to the 'value' inferred on the debtor, its estate, and its creditors." Lazard then postures that the remarkable success of NorthWestern's reorganization is due in large part to Lazard's role and team of professionals. Lazard argues the value to the Debtor's estate includes near 100% recovery for unsecured creditors (the Plan at confirmation pegged the unsecured debt at 78% payment), an attractive debtor-in-possession financing package, which ultimately resulted in renegotiation of one of the Debtor's existing financing agreements, saving nearly $7 million a year in annual interest, and a settlement with Montana regulatory authorities, which was critical to the Debtor's ability to confirm the Plan and regain a strong credit rating, with an 8.6% return on rate base through 2006.

However, Lazard laments that unlike *Public Service Co. of New Hampshire* and *Pacific Gas,* due to Debtor's pre-petition management of the company, recovery for common equity holders was not possible, as decisions made by management long before the filing of the chapter 11 petition, which are not explained in the record, had the effect of destroying equity value. Exhibit A to the bankruptcy petition shows the number of outstanding shares to stockholders was 37,396,762, held by 10,322 shareholders, Debtor's secured obligations were $525,070,000, senior unsecured obligations were $865,000,000 and unsubordinated unsecured obligations were $370,250,000.

I take a somewhat different view of NorthWestern's retention of Lazard. The terms of the Engagement Letter required Lazard to succeed in "delivery of binding consents to such *plan* by a sufficient number of *creditors and/or bondholders*" before Lazard was eligible to receive the Restructuring Fee. (emphasis added). Conspicuously absent from the agreement is a charge to Lazard to protect, in any manner, shareholder's interests. Indeed, a plain reading of the restructure paragraph is that the management and Lazard washed out any hope for shareholders one day after the bankruptcy petition was filed. In other words, the restructure never contemplated financial efforts or provisions to include the 10,322 shareholders. Indeed, Lazard's testimony at the confirmation hearing on valuation of the company at $1.5 billion cemented that wash out because it put the shareholders out of the money (Confirmation Order, p. 28), since no value above that amount would protect the shareholders as a class, which required a value of $2.2 to $2.3 billion (Confirmation Order, p. 30), as presented by the shareholders' expert witness.

Furthermore, as to unsecured creditors, they did not receive 100% value on their claims upon confirmation of the plan. Classes 7, 8 and 9 deal with unsecured note-holders and other unsecured creditors. In each of these classes, the notes and claims are extinguished and cancelled in return for new common stock—a debt for equity swap—which distributed each unsecured class 78% value, under the assumption that the new stock had a value of $20 per share.

Litigation over the Plan has not ceased. The Confirmation Order is on appeal by a class 8 creditor group (QUIPS) which also has pending litigation, which, if successful, could stand the Plan on its head. Moreover, as to the class 8(b) creditors (QUIPS), the Debtor on March 21, 2005, filed a motion (just over one year after filing the plan of reorganization), "to identify Individual Beneficial Group Holders"

because the Debtors "do not, and indeed never have had, any information regarding individual identity of the beneficial QUIP holders." (Docket No. 2927). The Plan Committee supports the effort to identify this class, but seeks additional relief in aid of consummation of the Plan. The Ad Hoc Committee of Class 7 Debtholders supports the motion to compel, with some sharp criticism the Plan's bifurcation of the QUIPS class because the Plan had no procedural mechanism to properly solicit and report the choices made by beneficial QUIPS holders in class 8(b), such that it created an unwieldy and unworkable scheme that securities markets are unaccustomed to handling![9]

Next we come to Debtor's motion to terminate pension plans that NorthWestern assumed under its purchase agreement with Montana Power. The Plan and Disclosure Statement provides that the payment of any Retiree Benefits shall continue solely to the extent the Debtor is legally obligated to pay such benefits, subject to the right of the Debtor to amend or terminate such plan benefits. These pension obligations total about $12 to $15 million on a present value formula set by the Debtor. Debtor states its reason for seeking such relief: "Termination of the BRP (and other Pension Benefits) will reduce NOR's future costs," in exchange for which NOR will issue class 9 shares to the beneficiaries. In other words, the Reorganized Debtor has a financial problem with these unfunded pension plans and again wants to swap debt for equity. One class of pension beneficiaries has filed a recent response to the termination motion, noting that such pension holders were never listed as unsecured creditors in the schedules, never received any ballots to vote for or against confirmation and never had any voice in formation of the plan, either from Lazard, the Debtor or Creditors Committee. These pension recipients were, according to their position, simply cut out of the reorganization process.

Finally, Magten Asset Management Corporation and Law Debenture, a trustee for the QUIPS bondholders, recently filed an adversary complaint to revoke the Order of Confirmation, on the grounds that the Plan was procured by fraud as to the Class 9 structure of dealing with stock payment to the general unsecured class. [Adv. Pro. No. 05–50866, April 15, 2005].

All of the above problems and dilemmas are hardly consistent with Lazard's glowing description of its services when it writes:

> As a result of Lazard's efforts to broker a consensual plan of reorganization, NorthWestern was able to exit from bankruptcy in a little over a year, saving the Company millions of dollars in bankruptcy and litigation related costs averaging approximately $4 million per month.

(Brief, p. 8). That tribute simply is belied by the post-confirmation conflicts that were not properly resolved by Lazard during the confirmation process.

Analysis of the Final Fee Application shows the following data: the total number of hours billed by Lazard during its tenure as financial advisor to the Debtor is 3213.4 hours, the overall blended hourly rate of the monthly fee is $809.11, and the blended hourly rate of the Restructuring Fee is $1711.58, for a total blended hourly rate of

---

**9.** Lazard's Brief states: "Lazard prepared valuation analysis and debt capacity reports that formed the basis of the structure and negotiation of the Plan. As part of this process, Lazard assisted the Debtor in the development and preparation of its business plan and long-term financial forecast. Lazard's valuation not only formed the basis of plan negotiators, but also played a key role in the consensual deal reached between unsecured claim holders and preferred equity holders." (Brief, p. 7).

$2520.69. It is noteworthy that the La-zard professional who billed the most time was the lowest ranking member of the team in terms of seniority (one year experience) who billed 1089.3 hours, or 1/3 of Lazard's time. The next highest billing professional was Mr. Yearly, who presented Lazard's financial valuation at the confirmation hearing. At this point I also note that the Committee's Financial Advisor, Houlihan, Lokey, Howard & Zukin, billed more hours than Lazard. Lazard noted in its brief that Lazard had a head start on Houlihan, explaining the difference in Houlihan's total time of 4662.8 hours, with a blended hourly rate of $920.85.

Regardless of Lazard's attempt to discredit the *Stations Holding* decision, I find it a noteworthy guide to market rate. The *Stations Holding's* Court found that the investment banker's hourly request of $6711.49 was excessive, and in the court's opinion, based on its experience and judgment regarding billing practice, a reasonable rate would not exceed $700 per hour. 2004 WL 1857116, at *3. This hourly rate is certainly consistent with Houlihan's billing rate, which equaled a blended hourly rate for its monthly fee was $487.90 and for its Transaction Fee was $432.95.

Finally, besides the ongoing litigation descried above, the amended disclosure statement lists eighteen pending and asserted litigations against the Debtors (Docket No. 1926, pp. 39–48). The point here is that Lazard touts as favorable the fact that this Plan was confirmed in just under thirteen months from the petition date (exclusive of any pre-petition planning), while cases like *Pacific Gas* took thirty months; and I note *New Hampshire Public Service Company* took over three years. Perhaps in the confirmation process haste may make waste, or it may also be a positive factor for the creditors. I simply do not think the time frame has any bearing on the ultimate success of a reorganization effort.

### B. *Expenses*

The major item of contention by the Fee Auditor and this Court on the expense side was Lazard's employment of outside counsel without submission of a section 327(a) application for approval of Lazard's law firm. The total expenses of Lazard's outside law firm was $56,169.00 for fees and $2,764.77 for expenses. Lazard has withdrawn this requested expenses item.

The requested expenses totaled $158,994.39, which included the $58,933.86 for outside counsel fees. The Fee Auditor challenged additional expense items, which Lazard generally conceded. Therefore, the Court finds the Fee Auditor's final finding of $97,701.62 to be reasonable for actual and necessary expenses.

### CONCLUSION

As to the Transaction Fee, the evidence submitted by Lazard using a percentage of funded debt is completely out of step with section 330(a)(3)(E), which requires the Court to consider the "customary compensation charged by comparably skilled practitioners in cases other than cases under this title." As conceded at the hearing, the majority, if not all, of the cases relied upon by Lazard are fees assessed in bankruptcy, not non-bankruptcy cases, and therefore do not meet the criteria of section 330(a)(3)(E).

Accordingly, I will assess Lazard's fee on an hourly basis and treat the "Transaction Fee" separately. I determine a reasonable hourly rate of $900.00 per hour is representative of the market, so that the reasonable fee of $2,892,060.00 is awarded. As to the Transaction Fee, I have little difficulty in fixing that contractual rate at 50% of the negotiated contract, which brings it in line with the transaction fee of

the financial advisors employed by the Official Committee of Unsecured Creditors. Thus, the transaction fee is fixed at $2,750,000, so that a reasonable total fee for Lazard is fixed at $5,392,060.00, plus $97,701.62 for reasonable expenses.

A separate order shall enter.